**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: ERIE COVID-19 BUSINESS | ) | Master Docket No. 1:21-mc-1 |
| INTERRUPTION PROTECTION | ) | |
| INSURANCE LITIGATION | ) | MDL No. 2969 |
| | ) | |
| This Document Relates to: All Cases | ) | Chief Judge Mark R. Hornak |

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

### I.  <u>INTRODUCTION</u>

Plaintiffs in this multidistrict litigation all operate distinct businesses—from a retail clothing store in the Shadyside neighborhood of Pittsburgh, Pennsylvania, to a Ford/Lincoln car dealership in Cook County, Illinois, to a mussel bar in the Nation's Capital, and more. Different as their businesses may be, Plaintiffs' legal claims are far less so—as compared to each other and to claims asserted by business owners in a multitude of similar cases nationwide.

Beginning in March 2020, Plaintiffs began to suffer significant financial consequences when they reduced their business operations or temporarily closed their businesses altogether following the outbreak of the global coronavirus pandemic (referred to herein as COVID-19), which has been one of the most serious public health events in history with devastating consequences across all aspects of life, including the loss of life itself. Plaintiffs filed insurance claims for their business losses with Defendant Erie Insurance Group ("Erie")[1] under the commercial property insurance policies Plaintiffs had purchased from Erie. Erie denied those claims. The resulting legal actions making up this litigation are 32 of thousands of actions in state

---

[1] "Defendant Erie Insurance Group is the trade name under which [Defendants] Erie Indemnity Company, Erie Insurance Exchange, and their subsidiaries and affiliates operate." (ECF No. 228 ¶ 5.) The Court uses "Erie" in this Opinion to refer to all Defendants.

and federal courts in which property owners with commercial insurance policies issued by Erie and other insurance carriers have alleged that their property insurers wrongfully denied COVID-19-related claims covered by their policies.

Against that backdrop and the law that has developed in this arena over the past two-plus years, the Court is not short of guidance from the parties and from the decisions of other courts as to how it should resolve the issues of law that these cases raise. Having thoroughly reviewed those sources and considered the parties' arguments, the Court will GRANT Defendants' pending Motion to Dismiss (ECF No. 238).

## II.    PROCEDURAL BACKGROUND

On January 7, 2021, the Judicial Panel on Multidistrict Litigation created and transferred to this Court this multidistrict litigation ("MDL"). (ECF No. 1.) The MDL currently consists of 32 actions involving 47 Plaintiffs, all of which seek insurance coverage for business losses following the onset of COVID-19.[2]

After the actions in this MDL were transferred to this Court, the Court sought and received the parties' input on case administration matters, including whether the parties suggested that the Court resolve the fully briefed dispositive motions already pending in some of the member cases or instead sought to file a Consolidated Amended Complaint ("CAC"). (ECF No. 210, at 2.) The Court permitted Plaintiffs to file a CAC only if all Plaintiffs in the MDL desired to do so, agreed that the CAC would serve as the operative complaint moving forward, and agreed to not seek further leave to amend absent a change in intervening, controlling law, or the discovery of facts previously unknowable. (*Id.* at 9.) All but one Plaintiff requested to move forward with a CAC, and the Court allowed Plaintiffs to file a CAC on behalf of all but that one Plaintiff, Steven A.

---

[2] The Motion to Dismiss that this Opinion addresses relates to 31 actions involving 46 Plaintiffs for reasons explained in this section.

Udesky OD & Associates P.C., finding good cause to do so based on briefing from all parties. (ECF No. 224, at 1–3.) The Court then stayed without prejudice the action by Plaintiff Udesky pending the Court's disposition of an anticipated dispositive motion as to the CAC. (ECF No. 233.)

Plaintiffs filed the CAC on October 28, 2021. (ECF No. 228). In it, Plaintiffs assert nine claims for relief[3]: (1) declaratory relief for Plaintiffs and class members under Erie's Ultrapack Plus Policy (one of the two Erie policies at issue in this case), specifically a declaratory judgment that Plaintiffs' asserted business interruption losses are covered under that Policy (Count One); (2) the same declaratory relief sought at Count One but as to Plaintiffs and class members under Erie's UltraFlex Policy (the other of the two Erie polices at issue in this case) (Count Two); (3) relief for breach of contract on behalf of Plaintiffs and class members under the Ultrapack Plus Policy (Count Three); (4) relief for breach of contract on behalf of Plaintiffs and class members under the UltraFlex Policy (Count Four); (5) relief under Illinois law for bad faith denial of insurance on behalf of Illinois-based Plaintiffs and class members (Count Five); (6) relief under New York General Business Law § 349 on behalf of New York-based Plaintiffs and class members (Count Six); (7) relief under New York law for breach of the fiduciary duty of good faith and fair dealing on behalf of New York-based Plaintiffs and class members (Count Seven); (8) relief under West Virginia law for breach of the duty of good faith and fair dealing on behalf of West Virginia-based Plaintiffs and class members (Count Eight); and (9) relief under Tennessee law for breach of the duty of good faith and fair dealing on behalf of Tennessee-based Plaintiffs and class members (Count Nine). (ECF No. 228, at 62–74.)

---

[3] Plaintiffs seek to assert these claims "individually and as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3)," seeking to represent "[a]ll policyholders in the United States who purchased commercial property insurance coverage including business income coverage [and other coverage provisions cited in the CAC] from Erie Insurance Group under [either] an Ultrapack Plus policy [or an UltraFlex policy], and who shut down or otherwise curtailed or limited in any way their business operations in response to the Mandated Shutdown Rules and/or the presence of the COVID-19 virus, but have not been afforded business income [or other claimed] coverage." (ECF No. 228 ¶ 235.)

On January 10, 2022, Erie filed the pending Motion to Dismiss Counts One, Two, Three, and Four of the CAC pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 238) and a brief in support of the Motion (ECF No. 239). Pursuant to a stipulation by the parties that this Court approved, the Motion to Dismiss seeks dismissal only of Counts One, Two, Three, and Four, and Erie's deadline to respond to the remaining asserted Counts is currently stayed without prejudice pending the Court's decision as to the Motion to Dismiss Counts One through Four. (*See* ECF No. 236, at 1.)[4] Plaintiffs filed their Brief in Opposition to the Motion to Dismiss on March 21, 2022 (ECF No. 246), and Erie filed its Reply Brief on April 11, 2022 (ECF No. 249). Oral argument as to the Motion to Dismiss occurred on May 16, 2022 (ECF No. 263).[5] The parties have also filed various Notices of Supplemental Authority (ECF Nos. 252, 253, 258, 265, 266, 267, 268, 269, 272, 279, 280, 281, 282, 283, 284) while the Motion to Dismiss has been pending.

The Motion to Dismiss is now ripe for disposition.

---

[4] The parties asserted that resolving Plaintiffs' claims in this fashion would "maximize efficiency and minimize any unnecessary expenditure of resources by the Parties or the Court." (ECF No. 234, at 2.) The Court explained on the record during a hearing on the stipulation that the parties' assessment appeared to be correct, since it appeared to the Court that if Plaintiffs are unable to plausibly show that they are entitled to declaratory relief and relief for breach of contract, and thereby overcome Erie's Motion to Dismiss Counts One through Four, Plaintiffs' claims at the remaining Counts would fail as a matter of law. *See Style Lounge Salon, Inc. v. W. Bend Mut. Ins. Co.*, No. 20-3721, 2021 WL 4477856, at *2 n.2 (N.D. Ill. Sept. 30, 2021) (bad faith denial of insurance claim under Illinois law fails if insurer properly denied coverage); *Buffalo Xerographix, Inc. v. Sentinel Ins. Co., Ltd.*, 544 F. Supp. 3d 345, 353 (W.D.N.Y. 2021) (claim under New York General Business Law § 349 fails if no "direct physical loss of or damage to" property that triggers coverage); *Broadway 104, LLC v. XL Ins. Am., Inc.*, 545 F. Supp. 3d 93, 103–04 (S.D.N.Y. 2021) (breach of duty of good faith and fair dealing claim under New York law only succeeds if insurer has wrongfully denied policyholder a right to coverage under the insurance agreement); *Julie's Inc. v. Hanover Ins. Grp., Inc.*, No. 20-853, 2021 WL 2312532, at *6 (M.D.N.C. June 7, 2021), *report and recommendation adopted*, No. 20-853, 2021 WL 5416685 (M.D.N.C. Nov. 19, 2021) (breach of duty of good faith and fair dealing claim under West Virginia law fails if insurer has no contractual duty to provide coverage); *Creative Bus., Inc. v. Covington Specialty Ins. Co.*, 559 F. Supp. 3d 660, 674 (W.D. Tenn. 2021) (breach of duty of good faith and fair dealing claim under Tennessee law not viable if policyholder not entitled to coverage).

[5] The Court combined the oral argument on the Motion to Dismiss the actions in this MDL with oral argument on the Motions to Dismiss in three other COVID-19 business interruption insurance cases on the Court's docket (*Hirschfield-Louik v. Cincinnati Insurance Co.*, No. 20-cv-816, *Zunino v. Sentinel Insurance Co.*, No. 20-cv-1260, and *Taiclet v. Transportation Insurance Co.*, No. 20-cv-1552) that involve facts and issues of law common with, or at least similar to, those in the MDL. (ECF No. 243.) At oral argument, Plaintiffs in the *In re: Erie*, *Hirschfield-Louik*, *Taiclet*, and *Zunino* actions argued as a group, as did Defendants in all of those actions, and the parties identified for the Court any arguments that pertained only to specific actions.

III.     **FACTUAL BACKGROUND**[6]

    a.  **The Insurance Policies**

Plaintiffs collectively consist of several businesses—such as retail stores, restaurants, car dealerships, hair salons, and dental practices—located in the District of Columbia, Illinois, Maryland, New York, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. (ECF No. 228 ¶¶ 17–63.) At the times relevant to these actions, each Plaintiff had a contract of "all risk" commercial property insurance with Erie. (*Id.* ¶¶ 69, 72.) The contract was either the Ultrapack Plus Policy or the UltraFlex Policy (collectively, "the Policies"). (*Id.* ¶ 73.) Both Policies "provide substantially identical coverages in relevant part." (*Id.* ¶ 74.)

Specifically, both Policies contain an "insuring agreement" that states: "[Erie] will pay for direct physical 'loss' of or damage to covered property at the premises described in the 'Declarations' caused by or resulting from a peril insured against." (ECF No. 228-2, at 2.)[7] "Loss" wherever used in the Policies is defined as "direct and accidental loss of or damage to covered property" (*id.* at 36), and "peril insured against," also called "covered cause of loss," means "direct physical 'loss,' except 'loss' as excluded or limited in th[e] [P]olic[ies]" (*id.* at 6).

The Policies contain five primary categories of coverage encompassed within the "insuring agreement," one of which is "additional income protection." (*Id.* at 2–5 (describing the five coverage categories: "building(s)," "business personal property and personal property of others,"

---

[6] These facts are based on the allegations within the CAC, which, as set forth below, the Court must generally accept as true for purposes of ruling on the pending Motion to Dismiss. *Blanyar v. Genova Products, Inc.*, 861 F.3d 426, 431 (3d Cir. 2017).

[7] As the source of the language from the Policies, the Court cites to the portions of an exemplar UltraFlex Policy that Plaintiffs filed with the CAC (ECF No. 228-2). Plaintiffs also filed portions of an exemplar Ultrapack Plus Policy (ECF No. 228-1), and Erie filed copies of the entire Ultrapack Plus Policy that Erie issued to one Plaintiff (ECF No. 238-3) and of the entire UltraFlex Policy that Erie issued to another Plaintiff (ECF No. 238-4). All relevant language for this Opinion appears in the exemplar UltraFlex Policy that Plaintiffs filed, such that the Court need only cite to that document for language from the Policies.

"additional income protection," "glass and lettering," and "signs, lights, and clocks").) "Additional income protection," in turn, includes three types of income coverage that are relevant here.

The first type is "income protection," which covers a policyholder's "loss of 'income' and/or 'rental income' [] sustain[ed] due to partial or total 'interruption of business' resulting directly from 'loss' or damage to property on the premises described in the 'Declarations' from a peril insured against." (*Id.* at 4.) Second, "extra expense" coverage covers a policyholder's "necessary expenses [] incur[red] due to partial or total 'interruption of business' resulting directly from 'loss' or damage to property on the premises described in the 'Declarations' from a peril insured against." (*Id.*) In both "income protection" and "extra expense" coverage, "'interruption of business' means the period of time that [the policyholder's] business is partially or totally suspended . . . [b]egin[ning] with the date of direct 'loss' to covered property caused by a peril insured against[,] and [] [e]nd[ing] on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." (*Id.* at 36.)

The third relevant type of coverage contained within the Policies' "additional income protection" provisions is "civil authority" coverage. (*Id.* at 5.) Under civil authority coverage, Erie pays for a policyholder's lost income, lost rental income, and/or extra expenses incurred "[w]hen a peril insured against causes damage to property *other than*" the policyholder's property, "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage" to the other property, and the policyholder's property is within the area to which access is prohibited. (*Id.* (emphasis added).)

For civil authority coverage to apply, the policyholder's property that is inaccessible due to an order of civil authority must be within one mile of the damaged property, and "[t]he action of civil authority [must be] taken [either] in response to dangerous physical conditions resulting

from the damage [at the other property] or continuation of the peril insured against that caused the damage, or . . . to enable a civil authority to have unimpeded access to the damaged property." (*Id.*)

In addition, as an "extension" of coverage related to "dependent properties," the Policies provide that "[Erie] will pay up to $25,000 for [the policyholder's] contingent income, meaning loss of 'income' and/or 'rental income' [] sustain[ed] due to partial or total 'interruption of business' resulting directly from 'loss' or damage to building(s) or business personal property of 'dependent properties' from a peril insured against." (*Id.* at 22.) As used in this "dependent property" coverage provision, "dependent property" generally "means premises operated by others whom [the policyholder] depend[s] on in any way for continuation of [the policyholder's] normal business operations." (*Id.* at 23.)

In the event of a covered cause of loss, the Policies require policyholders to "[p]rotect the[ir] property from further damage" and to "make reasonable repairs" when necessary. (*Id.* at 34.) Plaintiffs refer to this provision as a "sue and labor" provision. (ECF No. 228 ¶ 88.)

Each Policy contains "exclusions" that apply to its various categories of coverage. Both Policies contain a "law or ordinance" exclusion, which excludes from coverage any additional income protection or other coverage for loss of or damage to property "caused directly or indirectly by . . . the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any property, including the cost of removing its debris." (ECF No. 228-2, at 6–7.) The UltraFlex Policy also contains a "virus exclusion," which excludes from coverage any additional income protection or certain other categories of coverage for loss of or damage to property "caused . . . [b]y or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress,

illness, or disease." (*Id.* at 7–9.)

      **b.**  **COVID-19 and the "Mandated Shutdown Rules"**

COVID-19 refers to the novel strain of coronavirus that was first discovered in China in 2019 and the global pandemic that resulted from the outbreak of the virus. (*See* ECF No. 228 ¶¶ 113, 115; *Basics of COVID-19*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html (last updated Nov. 4, 2021).) "On March 11, 2020, the World Health Organization declared a global health pandemic based on existing and projected infection and death rates and concerns about the speed of transmission and ultimate reach of COVID-19." (ECF No. 228 ¶ 115.)

Shortly thereafter, starting on March 15, 2020, the Governors of Illinois, Maryland, New York, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia and the Mayor of the District of Columbia (as well as government leaders in other states in which Erie sells insurance policies) issued orders "requiring the temporary total or partial closure of all non-essential businesses" in an effort to mitigate COVID-19's spread. (*Id.* ¶¶ 131–77.) Plaintiffs refer to these orders as the "Mandated Shutdown Rules." (*Id.* ¶ 131.)[8]

Around the same time as the issuance of the Mandated Shutdown Rules, "[a]s a result of . . . the Mandated Shutdown Rules[] and/or the COVID-19 pandemic, all Plaintiffs' business operations temporarily closed either partially or fully." (*Id.* ¶¶ 17–63; 180.) Thus, Plaintiffs and class members "were unable to fully operate their businesses for their usual purposes." (*Id.* ¶ 181.) While the Mandated Shutdown Rules have at various times been modified to permit resumption of business operations in ways more consistent with pre-pandemic operations, Plaintiffs aver in

---

[8] Throughout this Opinion, the Court uses "Mandated Shutdown Rules" in discussing both the government orders at issue in the actions in this MDL and the government orders at issue in other cases limiting the operations of the plaintiffs' businesses in those cases.

the CAC that "[m]any businesses are still operating under significant restrictions." (*See id.* ¶¶ 178–79.)

COVID-19 is a "physical substance" that, as is well known, has "cause[d] [] long-term health effects" for many and is "potentially fatal." (*Id.* ¶ 116.) COVID-19 illness has caused over one million deaths in the United States alone. *COVID Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Oct. 12, 2022, 2:40 PM).

A theme within Plaintiffs' CAC is reference to what they say is the impact that COVID-19 has not just on people, but also on property. Specifically, Plaintiffs aver that COVID-19, which is "transmitted through airborne respiratory droplets," both "accumulates in the air" and "creates a chemical bond affixing it to surfaces" on which it alights, "which causes it to become hard to detach" from the surfaces. (ECF No. 228 ¶¶ 119–20.) According to a study by *The New England Journal of Medicine*, "COVID-19 remains stable and transmittible in aerosols for up to three hours, up to four hours on copper, up to twenty-four hours on cardboard and up to two to three days on plastic and stainless steel." (*Id.* ¶ 121 (citing *New Coronavirus Stable for Hours on Surfaces*, Nat'l Insts. of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces).) Another study published in the *Journal of Hospital Infection* found that "coronaviruses can remain infectious on inanimate surfaces at room temperature for up to 9 days." (*Id.* ¶ 122 (quoting Sofia Quaglia, *Coronavirus: 4 Studies Explain What You Need to Know About COVID-19 Sticking to Surfaces*, Inverse (Mar. 21, 2020), https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces).) "[S]ome cleaning products will both inactivate and remove COVID-19 from surfaces;" however, eradicating COVID-19 from a property is "nearly impossible" given its invisibility to

the human eye and ability to easily spread. (*Id.* ¶ 120.)

While the risk of transmission of COVID-19 particles from a surface to a person exists, "the greatest risk[]" of transmission is "airborne transmission where people are indoors, in close proximity, and without masks covering their mouths and noses." (*Id.* ¶ 125; *see id.* ¶ 128.) This is because "[i]nfected persons, whether they are or are not symptomatic, release infectious viral particles when breathing, talking, sneezing, or coughing." (*Id.* ¶ 125.) "[T]he best non-pharmaceutical methods available to slow and/or stop the spread of COVID-19 are screening and testing of potentially infected persons; contact tracing and quarantining infected persons; personal protection and prevention, such as masking; as well as social distancing, such as reducing certain physical human contacts or even restricting the movements of the total population." (*Id.* ¶ 130.)

Although "[a]t the time of the Mandated Shutdown Rules, there was no specific way to test for COVID-19 on surfaces, and human testing for COVID-19 was significantly delayed and difficult to obtain[,] . . . Plaintiffs believe and aver that COVID-19 was present on the premises of their Covered Properties." (*Id.* ¶¶ 191–92.) Some Plaintiffs "had one or more employees or customers report that they tested positive for COVID-19," while others "had employees or customers who reported being exposed to COVID-19 and/or quarantined because of exposure to COVID-19." (*Id.* ¶ 194.) The CAC does not indicate whether Plaintiffs not specifically mentioned as receiving such reports from employees or customers also received those reports, nor does it indicate the timing of these reports as to any Plaintiff.

c.  **Plaintiffs' Insurance Claims**

At some point after temporarily closing for business operations partially or fully, "Plaintiffs provided notice to Erie Insurance Group of their claims" for insurance coverage stemming from those closures. (*Id.* ¶ 183.) Consistent with an alleged decision by Erie "to issue blanket denials of

10

coverage for any business income losses arising out of or related to the Mandated Shutdown Rules and/or the COVID-19 pandemic," Erie denied Plaintiffs' claims, and Erie "has refused or will refuse to pay class members" who file similar claims. (*Id.* ¶¶ 183–84, 186.) Plaintiffs aver that Erie did not "properly and fully adjust[] the claims," but rather "performed a perfunctory investigation designed to elicit information that would buttress its unilateral decision to deny all COVID-19 business interruption claims." (*Id.* ¶ 185.)

After Erie denied Plaintiffs' claims, Plaintiffs filed the actions contained within this MDL on behalf of Plaintiffs individually and members of the classes they seek to represent. Plaintiffs allege that Erie wrongfully denied them coverage under the income protection, extra expense, civil authority, dependent property, and/or sue and labor coverage provisions within their Policies. (*Id.* ¶ 235 n.77.)

## IV.   **GOVERNING LEGAL PRINCIPLES**

### a.   **Legal Standard for Motions to Dismiss Pursuant to Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not enough to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, a plaintiff's factual allegations must "raise a right to relief above the speculative level" and state a plausible claim for relief. *Twombly*, 550 U.S. at 555.

In reading the complaint, the court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009)). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a *factual situation* which is or is not justiciable." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 (3d Cir. 1998)) (alteration in original) (emphasis added).

The Third Circuit further guides lower courts to utilize a three-part framework in analyzing a 12(b)(6) motion. First, the court "identif[ies] the elements of the claim." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Second, the court "review[s] the complaint to strike conclusory allegations." *Id.* Third, the court "look[s] at the well-pleaded components of the complaint and evaluat[es] whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Id.* If the facts alleged in the complaint "show" that the plaintiff is entitled to relief, the court should deny the motion to dismiss. *See Fowler*, 578 F.3d at 210–11.

In ruling on a motion to dismiss, the only documents a court may consider are "the complaint, attached exhibits, matters of public record, and undisputedly authentic documents not attached to the complaint if the complainant's claims are based on those documents." *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 683 (W.D. Pa. 2013) (citing *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010)). Finally, a court evaluating a motion to dismiss must "draw on its judicial experience and common sense." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 177 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

### b.  **Applicable Substantive Law**

"[U]nder the rule of *Van Dusen v. Barrack*, 376 U.S. 612 (1964), a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed." *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993). Thus, as the transferee Court for the

actions in this MDL, this Court must apply the substantive state law of the jurisdictions in which those actions were filed: the District of Columbia, Illinois, Maryland, New York, Ohio, Pennsylvania, Tennessee, and West Virginia. (*See* ECF Nos. 1, at 6; 2, at 2; 11, at 2; 155, at 2; 166, at 3; 183, at 2; 196, at 2.)

In their Brief in Opposition to the Motion to Dismiss, Plaintiffs argue that this Court is permitted to apply Pennsylvania law to all actions in the MDL because "Erie fail[ed] to articulate [in its Motion to Dismiss] which law should apply to the specific claims of its insureds." (ECF No. 246, at 29–30.) In its Reply Brief and at oral argument, Erie argued that it has in fact articulated to the Court that the Court should apply the applicable substantive law of the multiple relevant jurisdictions whose law applies to these actions.[9]

During oral argument, Plaintiffs then agreed that this Court must "apply the [substantive law] from the transferor court and . . . sit as if [it] were th[e] judge from that court" (ECF No. 270, at 44), and Plaintiffs also seemed to anticipate that approach in its Brief in Opposition by arguing that even if the Court applies the law of jurisdictions beyond Pennsylvania, Plaintiffs should prevail (*see* ECF No. 246, at 28). Thus, the parties appear to now agree that the Court should apply the substantive law (which includes choice-of-law rules, *Menowitz*, 991 F.2d at 40) of each the jurisdictions in which the respective actions in this MDL were filed.

In discussing the substantive law of the jurisdictions in which the actions were filed, the parties focus on those jurisdictions' insurance contract interpretation law and do not explicitly discuss choice-of-law rules in those jurisdictions. Because each of the sets the facts underlying

---

[9] Specifically, Erie has urged the Court to apply "the applicable law[] of each of the nine jurisdictions" in which Plaintiffs' business properties are located. While Erie does not fully explain why those laws are the applicable ones in this case, the Court infers that Erie proposes as such (and Plaintiffs ultimately concede as such) because under the substantive insurance contract interpretation law of each of the eight jurisdictions in which these actions were filed— which this Court applies as the transferee court—courts in those jurisdictions would apply the law of the place in which the Plaintiffs' insured properties are located. *See, e.g.*, *4431, Inc. v. Cincinnati Ins. Cos.*, 504 F. Supp. 3d 368, 381 n.13 (E.D. Pa. 2020).

each diversity action in this MDL involve more than one state (*i.e.*, the state in which the policyholder and its business is located, and the state in which Erie is located), it is not readily apparent that choice-of-law is immaterial in these actions. However, as explained in the next section, the insurance contract interpretation law of the nine jurisdictions collectively involved in the facts of the actions in the MDL is the same in all respects relevant to this Opinion. Thus, a choice-of-law analysis as to which jurisdiction's substantive law the transferor courts in this MDL would have applied is unnecessary. *See Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) ("If [the] two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary." (quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007))).

Having determined that the Court must apply the substantive law of the transferee courts to the actions in this MDL, and that a choice-of-law analysis as to the applicable insurance contract interpretation law for each action is unnecessary for the reasons noted, the Court will apply the insurance contract interpretation law of the jurisdictions in which the actions in this MDL were filed.[10]

### c.  Insurance Contract Interpretation Under Applicable Law

#### i.  General Principles

"Insurance policies are contracts," so the common law rules of contract interpretation apply to the actions in this MDL. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517 (3d Cir. 2012)

---

[10] As explained in the previous footnote, the parties appear to suggest that under the insurance contract interpretation law in the jurisdictions in which these cases were filed, courts in those jurisdictions would apply the law of the jurisdiction in which Plaintiffs' business properties are located. Thus, Erie argues that this Court should apply Virginia law in the action involving a Virginia-based Plaintiff, even though neither that action nor any other action in the MDL were filed in Virginia. Because the insurance contract interpretation law in the jurisdictions in which the actions in the MDL were filed and the jurisdictions in which Plaintiffs' business properties are located is the same in all relevant respects, this nuance does not impact the Court's analysis of the Motion to Dismiss.

(quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 540 (2010)). The Court has examined the relevant general principles of contract interpretation in each of the jurisdictions in which the actions in this MDL were filed, including the authorities the parties have presented on that topic, and concludes that those principles are substantially similar in each of those jurisdictions. Thus, for efficiency, this Opinion describes those principles as applicable under Pennsylvania law and cites to cases explaining how those principles apply under the law of the other relevant jurisdictions.

The District Court for the Eastern District of Pennsylvania summarized Pennsylvania insurance contract interpretation law in *Moody v. Hartford Financial Group, Inc.*:

> Under Pennsylvania law, . . . "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg.*, LLC, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. Ct. 2005)).
>
> The Court's analysis begins with whether a provision in the insurance policy is ambiguous.[11] When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Group*, 879 A.2d 166, 170 (2005). "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted). A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).
>
> Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.* at [107]. The "proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the

---

[11] While not explicitly stated in *Moody*, courts apply ordinary rules of interpreting language in a contract, statute, or other legal document when determining whether language in an insurance contract is ambiguous. *See, e.g.*, *Ceres Enterprises, LLC v. Travelers Ins. Co.*, 520 F. Supp. 3d 949, 955–56 (N.D. Ohio 2021) (explaining that courts must consider the "plain language of the contract" as well as "the insurance policy as a whole" to "giv[e] meaning to each term and constru[e] the provisions within the context of the entire policy").

insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998). Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract in certain circumstances. *See Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994). Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable expectations. See *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. Ct. 2010).

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Once that burden is met, the insurance company "bears the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

513 F. Supp. 3d 496, 502–03 (E.D. Pa. 2021) (footnotes omitted).

Most of these principles also apply in the District of Columbia, Illinois, Maryland, New York, Ohio, Tennessee, and West Virginia (where the actions were filed), as well as Virginia (the additional jurisdiction in which Plaintiffs' properties collectively are located)—with the only significant difference being whether a policyholder's reasonable expectations matter only when the contract is ambiguous or rather can trump unambiguous language. *See Burk & Reedy, LLP v. Am. Guarantee & Liab. Ins. Co.*, 89 F. Supp. 3d 1, 8–9 (D.D.C. 2015), *aff'd sub nom.* 637 F. App'x 610 (D.C. Cir. 2016) (District of Columbia law); *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 503 F. Supp. 3d 602, 606 (N.D. Ill. 2020) (Illinois law); *Wallis v. Country Mut. Ins. Co.*, 723 N.E.2d 376, 381 (Ill. App. 2000) (Illinois law); *Hamilton Jewelry, LLC v. Twin City Fire Ins. Co., Inc.*, 560 F. Supp. 3d 956, 961–62 (D. Md. 2021) (Maryland law); *Chefs' Warehouse, Inc. v. Emps. Ins. Co. of Wausau*, No. 20 CIV. 4825 (KPF), 2021 WL 4198147, at *5 (S.D.N.Y. Sept. 15, 2021) (New York law); *Ceres Enterprises, LLC v. Travelers Ins. Co.*, 520 F. Supp. 3d 949, 955–56 (N.D. Ohio 2021) (Ohio law); *Acuity v. Masters Pharm., Inc.*, No. 2020-1134, 2022 WL 4086449, at *3 (Ohio Sept. 7, 2022) (Ohio law); *Andersen v. Highland House Co.*, 757 N.E.2d

329, 338 (Ohio 2001) (Cook, J., dissenting) (Ohio law); *1210 McGavock St. Hosp. Partners, LLC v. Admiral Indem. Co.*, 509 F. Supp. 3d 1032, 1038 (M.D. Tenn. 2020) (Tennessee law); *Acme Nashville LLC v. Cincinnati Ins. Co.*, No. 3:20-CV-00496, 2021 WL 4311211, at *3 (M.D. Tenn. Sept. 22, 2021) (Tennessee law); *Allied World Surplus Lines Ins. Co. v. Day Surgery Ltd. Liab. Co.*, 451 F. Supp. 3d 577, 583–84 (S.D.W. Va. 2020) (West Virginia law); and *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011), *aff'd sub nom. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N.C.*, 508 F. App'x 243 (4th Cir. 2013) (Virginia law).

## ii. <u>Application to COVID-19 Business Interruption Cases</u>

With the emergence of COVID-19 and the resulting lawsuits similar to those in this MDL, in which policyholders have sought coverage under their property insurance contracts for interruptions to their business operations related to COVID-19, courts have been required to apply the general principles of insurance contract interpretation summarized above to a somewhat novel factual context. Thousands of such cases in state and federal courts throughout the country have been decided. However, almost none have been decided by the highest courts of the jurisdictions whose law applies to the MDL actions, leaving some uncertainty as to how those courts would decide the issues of state common law under the law of those jurisdictions.

When a district court applies a particular jurisdiction's substantive law, "[i]n the absence of a definitive ruling by [the jurisdiction's] highest court, [the district court] must predict how that court would rule if faced with the issue." *Lupu v. Loan City, LLC*, 903 F.3d 382, 389 (3d Cir. 2018) (quoting *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d. Cir. 2011)). "In so doing, [the district court] must look to decisions of [] intermediate appellate courts [within that jurisdiction], of federal courts interpreting that [jurisdiction's] law, and of other [jurisdictions' highest] courts

that have addressed the issue, as well as to analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the [jurisdiction] would decide the issue at hand." *Id.* As to an intermediate appellate court decision within the jurisdiction, where that decision "rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the [jurisdiction] would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

In its brief in support of its Motion to Dismiss, Erie urges this Court to place great weight on the available decisions by federal Courts of Appeals that have decided the issues raised in this MDL under the law of the jurisdictions whose law applies to these actions. Defendants assert that "[t]he law is well established that where a circuit court of appeals makes a determination concerning the law[] of a state within that circuit, 'the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule.'" (ECF No. 239, at 42 (quoting *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 282-83 (2d Cir. 1981)) (citing *Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 796 (4th Cir. 1993); *Ehrenfelt v. Janssen Pharm., Inc.*, 737 F. App'x 262, 265 (6th Cir. 2018); *Dawn Equip. Co. v. Micro-Trak Sys., Inc.*, 186 F.3d 981, 989, n.3 (7th Cir. 1999); *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 125-26 (D.C. Cir. 1986)).)

While the Third Circuit has not stated this principle as clearly as have the Courts of Appeals that decided the cases cited by Erie, the significant support for this approach in the Courts of Appeals substantially suggests that such approach is appropriate. *See, e.g.*, *Jones Truck Lines v. Transp. Ins. Co.*, No. 88-5723, 1989 WL 49517, at *5 (E.D. Pa. May 10, 1989) (concluding this

reasoning was persuasive based on only the Second and District of Columbia Circuits' articulation of the rule). Further, courts within the Third Circuit have considered themselves bound by Third Circuit cases that have predicted issues of state law when they are adjudicating claims under that law, which suggests that district courts should do the same when predicting issues of law of states outside of the Third Circuit and on which a federal Court of Appeals has spoken. *See Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 625 (W.D. Pa. 2012) (citing *Largoza v. Gen. Elec. Co.*, 538 F. Supp. 1164, 1166 (E.D. Pa. 1982)).

## V.   ANALYSIS

### a.   Coverage

As the insured parties, Plaintiffs "bear[] the burden to make a prima facie showing" that their claims for coverage fall within the Erie Policies' grant of coverage. *Moody*, 513 F. Supp. 3d at 502. Thus, the Court begins its analysis of the Motion to Dismiss by considering whether Plaintiffs have plausibly made this showing.

### i.   Types of Coverage Claimed and the Threshold Requirement of "Direct Physical Loss of or Damage to" Property

Plaintiffs claim that they are entitled to "income protection," "extra expense," and "sue and labor" provision coverage based on what they allege is "direct physical loss of or damage to" their properties as a result of the COVID-19 pandemic and the Mandated Shutdown Rules, and that they are entitled to "civil authority" and "dependent property" coverage based on alleged "direct physical loss of or damage to" *other* properties and the inability for Plaintiffs to access their property due to governmental orders related to that damage or to perform certain business functions based on that damage. (ECF No. 228 ¶¶ 188–97.) A threshold requirement for any of the provisions under which Plaintiffs claim coverage is that "direct physical loss of or damage to" property—whether Plaintiffs' properties or other property—occurred as a result of a "covered

19

cause of loss." (ECF No. 228-2, at 2, 4, 5.)

Plaintiffs assert two "covered cause[s] of loss" that caused what Plaintiffs argue is "direct physical loss of or damage to" property: (1) COVID-19 itself and (2) the Mandated Shutdown Rules issued to mitigate the virus's spread. (ECF No. 228 ¶¶ 188–89.) Under the Policies, a "covered cause of loss," also called a "peril insured against," is a "direct physical 'loss,' except 'loss' as excluded or limited in th[e] [P]olic[ies]." (ECF No. 228-2, at 2, 6.) In other words, a "covered cause of loss" must itself be of a physical nature,[12] and the impact that it has on property—*i.e.*, what it causes—must meet the definition of "direct physical loss of or damage to" covered property.

The parties' primary dispute as to whether either asserted "covered cause of loss" leads to coverage under the Policies is whether those events caused "direct physical loss of or damage to" covered property, which as stated and as the parties agree is a prerequisite for the types of coverage that Plaintiffs claim they were entitled to under their Policies. Thus, the Court must interpret the phrase "direct physical loss of or damage to" property to decide whether Plaintiffs have plausibly demonstrated that such occurred as a result of COVID-19 itself or the Mandated Shutdown Rules.

### ii.  **The Parties' Arguments**

In its brief supporting its Motion to Dismiss, Erie argues that "direct physical loss of or damage to" property unambiguously "requires a tangible, concrete physical harm" to the property, which "cannot be plausibly alleged here." (ECF No. 239, at 48.) "[T]he words 'direct [and]

---

[12] While Plaintiffs seemed to dispute this point in the CAC and in their Brief in Opposition to the Motion to Dismiss (*see* ECF No. 246, at 26, 35 (arguing that "[t]he Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policies" and then accounting for the word "physical" by arguing that physical loss occurs when a property owner has lost the use of its "physical premises")), Plaintiffs then conceded during oral argument that the covered cause of loss must be "physical in nature" (*see* ECF No. 270, at 90:13–91:6 (stating that the covered cause of loss must be "physical in nature" and "[h]a[ve] [] to do with a physical substance"), 157:1–:6 (stating that if Plaintiffs had only alleged that the Mandated Shutdown Rules alone, and not the COVID-19 pandemic, were a covered cause of loss, Plaintiffs may have had "an impossible case")).

physical' modify both 'loss of' and 'damage to,'" and thus, Erie argues, whether "loss of" or "damage to" property is claimed, the loss or damage must consist of a physical—*i.e.*, concrete and tangible—impact to the property. (*Id.* at 48–49.) Erie argues that concluding otherwise would render the word "physical" meaningless. (*Id.* at 49–50.)

Erie also asserts that other language in the Policies confirms that "direct physical loss of or damage to" property "refers to actual, concrete and tangible damage to property—as opposed to mere loss of customers," for instance. (*Id.* at 53.) Specifically, "income protection" and "extra expense" coverage under the Policies, which cover the policyholder's lost income and necessary expenses caused by "direct physical loss of or damage to" the covered property, provide coverage for a certain time period: that in which there is an "interruption of business," which is defined as the time it takes to "repair[], rebuil[d], or replace[]" the covered property that has been lost or damaged. (*See id.* at 53–54; ECF No. 228-1, at 4, 36.)[13, 14] "As the cases [interpreting policies similar to those here] teach, construing 'physical loss' [or damage] to mean something that is not capable of being repaired, rebuilt or replaced—like restrictions on use due to a governmental order—would render the period of restoration clause utterly meaningless, in violation of Pennsylvania and other states' law requiring the court to endeavor to give meaning to all policy terms and read[] all terms in harmony." (*Id.* at 57.)

Anticipating Plaintiffs' argument that there must be a difference between "loss of" and "damage to" in the disjunctive phrase "direct physical loss of *or* damage to" property (emphasis added)—such that "loss" need not require a physical alteration of property, even if "damage"

---

[13] As explained earlier in this Opinion, the definition of "interruption of business" provides that the time period for "income protection" and "extra expense" coverage begins with the date of the loss or damage to the covered property and ends on the date that that property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality." (ECF No. 228-2, at 36.)

[14] Erie refers to the "interruption of business" clause describing the time period of coverage as a "period of restoration" clause. (ECF No. 239, at 36.)

does—Erie cites cases that have concluded that the difference "is clear" and is *not* that "damage" requires physical changes while "loss" does not. Rather, according to those cases, loss "means the complete destruction of a property, whereas 'damage' means the partial destruction of property." (*Id.* at 50–51.)

Based on its interpretation of "direct physical loss of or damage to" property as requiring physical alteration to property, Erie argues that COVID-19, despite its physical presence and Plaintiffs' allegations that the virus particles attach to and thereby physically alter property, does not cause "direct physical loss of or damage to" property. Erie emphasizes Plaintiffs' own statement in the CAC that "some cleaning products will both inactivate and remove COVID-19 from surfaces," which obviates Plaintiffs' contention that the virus physically alters property. (*Id.* at 59.) Erie cites to extensive case law from the jurisdictions relevant to the consideration of the Motion to Dismiss that has rejected the notion that COVID-19 virus particles cause "physical loss of or damage to" property and in doing so has rejected the argument by policyholders in similar cases that COVID-19 is comparable to "asbestos and other toxic and noxious substances [that courts have found] render premises uninhabitable." (*Id.* at 59–66.)

Further, Erie argues that the Mandated Shutdown Rules did not cause "direct physical loss of or damage to" property because they did not physically alter Plaintiffs' properties nor did they render those properties useless or uninhabitable. According to Erie, the loss of some use of those properties that resulted from the Mandated Shutdown Rules "is not enough" to demonstrate physical loss of or damage to property, as an "overwhelming" volume of courts have concluded. (*Id.* at 71.)

In response to Erie's Motion to Dismiss, Plaintiffs argue that there is another reasonable interpretation of the phrase "direct physical loss of or damage to" property that does not require

that the property be physically altered, and that the existence of this alternative reasonable meaning of the phrase makes it ambiguous and requires that the Court construe the Policies such that coverage for the policyholders has been plausibly pleaded. (ECF No. 246, at 36–37.)

Plaintiffs rely heavily on three cases from Pennsylvania Courts of Common Pleas—and in particular, *Ungarean v. CNA*, No. 20-6544, 2021 WL 1164836 (Pa. Ct. Com. Pl. Mar. 25, 2021), in which that court concluded that "[t]he spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which [the policyholder] materially utilized its property and physical space"—and thus "direct[ly]" caused a loss of use of "physical" property even without physical alteration to the property. (*Id.* at 18–19 (citing *Ungarean*, 2021 WL 1164836, at *7)) According to Plaintiffs, those cases reasonably concluded that the loss of *use* of property due to the Mandated Shutdown Rules and without any damage to the property is a covered loss under polices like Erie's. (*Id.* at 32–33.)

Plaintiffs also argue that cases exploring the meaning of "direct physical loss of or damage to" property before the emergence of COVID-19 have concluded that physical alteration to property is unnecessary when an owner of covered property is otherwise unable to use the property for its intended purpose. (*See id.* at 67–68.) According to Plaintiffs, the fact that "many state and federal courts [have] endors[ed] Plaintiff's view [] that loss of functionality constitutes direct physical loss or damage" without physical alteration being required "demonstrate[s] that Plaintiffs advance a reasonable construction of the Policies." (*Id.* at 63–64.)

Plaintiffs also assert that the evolution of standard insurance policy forms developed by the Insurance Services Office (ISO), which the Erie Polices incorporate, suggests that "loss of" property does not need to be tied to a physical impact to the property for income protection coverage to apply. Specifically, in 1976, commercial insurance policy provisions related to real

23

property and personal property coverage (as opposed to income protection coverage) were expanded to insure against "all risks of direct physical *loss*," not just risks of damage, and such expanded coverage protected against non-physical impacts to property, "such as loss of money and securities, coverage for employee dishonesty, and coverage for theft." (ECF No. 246, at 24.) Thus, Plaintiffs argue, when the ISO expanded income protection coverage provisions to insure income in the event of "loss of" property, the ISO intended those policy forms to create coverage in the event of a non-physical impact to the use of the property. (*Id.* at 23–25.)

### iii.   The Meaning of "Direct Physical Loss of or Damage to" Property

To ascertain the meaning of "direct physical loss of or damage to" property and predict how it would apply to the facts in these MDL actions under the substantive law of the jurisdictions whose law applies to those actions, the Court considers the following: (1) decisions by those jurisdictions' highest courts, those jurisdictions' intermediate courts, and federal courts applying those jurisdictions' law in COVID-19-related insurance cases; (2) pre-COVID-19 pandemic insurance cases that indicate how the jurisdictions' highest courts might apply their law to the unique factual context presented in these actions; and (3) other relevant information, including the decisions in other COVID-19 business interruption insurance litigation throughout the country.[15]

*Virginia.* Of the highest courts within jurisdictions whose law applies to the actions in this MDL, only one has spoken on either the meaning of "direct physical loss of or damage to" property in the COVID-19 business interruption litigation context or on whether the COVID-19 virus itself or Mandated Shutdown Rules cause such loss or damage.[16] In *Crescent Hotels & Resorts LLC v.*

---

[15] In the discussion that follows, the Court primarily uses "direct physical loss of or damage to" property—the language in the Erie Policies—to describe the language that courts in other COVID-19 business interruption insurance cases have interpreted because those cases interpreted either identical language or similar language that includes the key terminology of "physical" loss or damage.

[16] Cases are pending in the highest courts of two other jurisdictions involved in this MDL: Maryland (*Tapestry Inc. v. Factory Mutual Insurance Co.*, No. COA-MISC-0001-2022) (addressing a question certified by the U.S. District Court

24

*Zurich American Insurance Co.*, the Supreme Court of Virginia denied the plaintiff's petition for appeal from the lower court's ruling granting the defendant's motion for demurrer as to the plaintiff's claims that its business losses sustained due to the presence of COVID-19 on the plaintiff's property were covered under the plaintiff's property insurance policy. No. 211074, 2022 Va. Unpub. LEXIS 9, at *1 (Apr. 14, 2022). The Virginia Supreme Court stated: "Upon review of the record in this case and consideration of the argument submitted in support of and in opposition to the granting of an appeal, the Court is of the opinion there is no reversible error in the judgment complained of." *Id.*

The lower Virginia state court issued its ruling sustaining the defendant's demurrer from the bench, concluding that the "presence of a virus" does not "create[] a physical loss or damage." *Carilion Clinic v. Am. Guarantee & Liab. Ins. Co.*, No. 21-168, ECF No. 48-2, at 24 (W.D. Va. July 19, 2021) (including the transcript from the *Crescent Hotels* lower court ruling as an attachment in support of a motion to dismiss). The lower court also stated: "I'm sure our Supreme Court will grant you a petition in this case because it's an important issue that I think minds greater than mine, with your assistance, need to decide." *Id.* However, the Supreme Court of Virginia determined that the lower court had been correct and declined to grant the plaintiff's petition to appeal. *Crescent Hotels*, 2022 Va. Unpub. LEXIS 9, at *1. While neither the ruling of the lower court or nor that of the Virginia Supreme Court elaborates on the basis for concluding that the presence of COVID-19 on property does not cause "direct physical loss of or damage to" that property, the rulings demonstrate that such is the case under Virginia law.

For several other jurisdictions whose law applies to actions in this MDL—Illinois, Maryland, New York, Ohio, and West Virginia—while the jurisdiction's highest court has not yet

---

for the District of Maryland) and *Neuro-Communication Servs. Inc. v. Cincinnati Ins. Co.*, No. 2021-0130 (addressing a question certified by the U.S. District Court for the Northern District of Ohio).

decided a case of this type, a federal Court of Appeals has issued a decision interpreting the meaning of "direct physical loss of or damage to" property under that state's law and in the COVID-19 business interruption context. As explained above, unless this Court has reason to believe that those federal appellate decisions on state law "disregarded clear signals emanating from the state's highest court pointing toward a different" outcome, the Court should defer to those decisions' reasoning. *E.g.*, *Ehrenfelt*, 737 F. App'x at 265 (quoting *Sutherland v. DCC Litig. Facility, Inc. (In re Dow Corning Corp.)*, 778 F.3d 545, 548 (6th Cir. 2015)). As for the other relevant jurisdictions in this MDL that lack a decision by the jurisdiction's highest court, the jurisdiction's intermediate appellate court, or a federal Court of Appeals applying that jurisdiction's law, on whether COVID-19 or the related Mandated Shutdown Rules constitute "direct physical loss of or damage to" property, there are cases that are otherwise instructive.

*Illinois*. In *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, the Seventh Circuit concluded that under Illinois law, "'direct physical loss' [generally] requires physical alteration to property," and that under some circumstances, "a loss of use, unaccompanied by any physical alteration to property, might be so pervasive as effectively to qualify as a complete physical dispossession of property and thus a 'direct physical loss.'" 20 F.4th 327, 333–34 (7th Cir. 2021).

In reaching this conclusion, the court relied on cases from Illinois state courts, including two from the Illinois Supreme Court, that interpreted similar phraseology from commercial property insurance policies in pre-COVID-19 pandemic contexts. First, in *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, the Illinois Supreme Court held that "the term 'physical injury' unambiguously connotes . . . an alteration in appearance, shape, color or in other material dimension." *Id.* at 331 (citing *Eljer*, 757 N.E.2d 481, 502 (Ill. 2001)). Second, in *U.S. Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, the Illinois Supreme Court concluded that "asbestos fiber

26

contamination constitutes physical injury to tangible property." *Id.* at 333–34 (citing *Wilkin*, 578 N.E.2d 926, 931 (Ill. 1991)). The *Wilkin* court explained that asbestos fiber contamination amounts to "physical injury to tangible property" because it causes contamination "to the point where corrective action, under the law, must be taken." *Wilkin*, 578 N.E.2d at 931–32 (quoting *Board of Education v. A.C. & S., Inc.* (546 N.E.2d 580, 590 (Ill. 1989)). In reaching that conclusion in *Wilkin* and other cases, the Illinois Supreme Court has recognized that even if no "alteration in appearance, shape, color, or [] other material dimension" of any property occurs, *Eljer*, 757 N.E.2d at 502, a physical substance like asbestos fibers can constitute physical injury to property if it is present to so substantial a degree that it renders that property impossible to use in any way until the damage is repaired. *See Wilkin*, 578 N.E.2d at 931–32.

In addition to relying on cases from Illinois state courts to draw its conclusion about the meaning of "direct physical loss of or damage to" property, the Seventh Circuit in *Sandy Point* concluded that the policy at issue contained other "textual clues" indicating that "'direct physical loss' [generally] requires a physical alteration to property"—most notably, "the 'period of restoration[]' [clause], which is defined by reference to '[t]he date [by which] the property . . . should be repaired, rebuilt, or replaced.'" *Sandy Point*, 20 F.4th at 333. The court reasoned that "[w]ithout a physical alteration to property, there would be nothing to repair, rebuild, or replace."[17] *Id.*

---

[17] The Plaintiffs cite to and rely on a multidistrict litigation case in which an Illinois District Court held that "a reasonable jury [could] find that the Plaintiffs did suffer a direct 'physical' loss of property" because of the COVID-19 shutdown orders and "the Plaintiffs need not plead or show a change to the property's physical characteristics." *In re: Soc'y Ins. Co. COVID Bus. Interruption Prot. Litig.*, 521 F. Supp. 3d 729, 741–42 (N.D. Ill. 2021). However, based on this Court's reading of the standard later set out in *Sandy Point*, that conclusion appears to no longer hold. *See Sandy Point*, 20 F.4th at 332–34 (finding that "direct physical loss" requires a physical alteration to the property involved). Additionally, the conclusion and reasoning in *In re: Soc'y* has been considered and not adopted in a number of subsequent cases. *See Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 974 N.W.2d 442, 448–49 (Wis. 2022); *Sweet Berry Cafe, Inc. v. Soc'y Ins., Inc.*, 193 N.E.3d 962, 977–78 (Ill. App. Ct. 2022), *appeal denied*, 2022 IL 128399 (Ill. Sept. 28, 2022); *Menominee Indian Tribe of Wisconsin v. Lexington Ins. Co.*, 556 F. Supp. 3d 1084, 1097–98 (N.D. Cal. 2021); *Town Kitchen LLC v. Certain Underwriters at Lloyd's, London*, 522 F. Supp. 3d 1216, 1223–24 (S.D. Fla. 2021).

The court then concluded that the plaintiff had not and could not show that either the COVID-19 virus itself or the Mandated Shutdown Rules caused "direct physical loss" to the plaintiff's property. As to COVID-19 itself, the court wrote that even if the plaintiff had alleged, or amended its complaint to allege, that COVID-19 particles were physically present at the plaintiff's property and attached themselves to surfaces within the property, such an allegation would fall short of showing that the virus physically altered the plaintiff's property, and "there is no reason to think" that that would have occurred. *Id.* at 335. The court reasoned: "While the impact of the virus on the world over the last year and a half can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days." *Id.*

As to the Mandated Shutdown Rules, the Seventh Circuit explained that at most, those mandates prevented the plaintiff from "put[ting] its property to its preferred (and, we assume, its most lucrative) use," and such circumstances are "a far cry from the complete physical dispossession of property suffered by the policyholders" in cases in which substances like asbestos fibers were held to constitute direct physical loss in the absence of physically altered property due to the extent of the loss of use (*i.e.*, total, even if temporary, loss of all use). *Id.*

Thus, the court in *Sandy Point* concluded that the plaintiff had not demonstrated that either alleged cause of "direct physical loss of or damage to" its property met the definition of that phrase under the plaintiff's insurance policy and based on Illinois law. *See id.* The Seventh Circuit has reiterated this conclusion in multiple decisions issued since *Sandy Point*. *See, e.g.*, *Melcorp, Inc. v. W. Am. Ins. Co.*, No. 21-2448, 2022 WL 2068256, at *3 (7th Cir. June 8, 2022) ("Similar to the [policyholders] in the prior cases, Melcorp has failed to allege either a physical alteration to the property or a complete physical dispossession. Melcorp presented no evidence of any physical

impact to the property . . . . As was the case for all of the businesses in the cases that we have considered, Melcorp was clearly deprived of its intended use of the property at least temporarily, but it does not allege physical dispossession or physical alteration of the property sufficient to constitute 'direct physical loss' under the language of the policy.").

Decisions by the Illinois Appellate Court have reached the same conclusion as *Sandy Point*, and on similar grounds, as to the meaning of "direct physical loss of or damage to" property and in the COVID-19 context, which provides further evidence of how the Illinois Supreme Court would decide a COVID-19 business interruption insurance case. *See Lupu*, 903 F.3d at 389. For example, in *Ark Restaurants Corp. v. Zurich American Insurance Co.*, the Illinois Appellate Court identified *Eljer*—which *Sandy Point* cited to for the definition of "physical injury" as "an alteration in appearance, shape, color or in other material dimension," 20 F.4th at 331—as "the definitive statement in Illinois insurance law on the meaning of the [defendant's] policy phrase 'direct *physical* loss of or damage to property.'" No. 1-21-1147, 2022 WL 2159012, at *4 (Ill. App. Ct. 2022).

The *Ark Restaurants* court also looked to other sections of the policy at issue to determine the meaning of the phrase "direct physical loss of or damage to" property, applying Illinois law that requires "constru[ing] insurance contracts as a whole, giving effect to every provision, if possible." *Id.* at *6 (internal quotation marks omitted). In doing so, the court determined that "direct physical loss of or damage to" property did not include the plaintiff's claimed economic losses from loss of use of its property for its usual purpose. *See id.* In another case, the Illinois Appellate Court concluded that the plaintiff's allegations as to a physical impact on its property did not rise to the level of "a physical alteration *or* substantial dispossession" of property that must be present for "direct physical loss of or damage to property" to occur. *State & 9 St. Corp. v. Soc'y*

*Ins.*, No. 1-21-1222, 2022 WL 2379361, at *7, *11 (Ill. Ct. App. 2022).

      **New York.** Like the Seventh Circuit in *Sandy Point*, in which Illinois law applied, the Second Circuit in *10012 Holdings, Inc. v. Sentinel Insurance Co.*, 21 F.4th 216 (2d Cir. 2021), relied on existing New York state court case law to determine whether, under New York law, a plaintiff claiming coverage for COVID-19-related business losses had plausibly alleged "direct physical loss of or damage to" its property. In *10012 Holdings*, the plaintiff only alleged that the Mandated Shutdown Rules were a covered cause of loss, and not that COVID-19 itself physically altered its property. *See id.* at 219. The Second Circuit followed the holding of *Roundabout Theatre Co. v. Continental Casualty Co.*, in which the New York Appellate Division concluded that the plaintiff, which operated a theater that was inaccessible to the public for several weeks due to street closures, had not suffered "direct physical loss of or damage to" its property when the property suffered no material damage.[18] *Id.* at 220–21 (citing *Roundabout Theatre*, 751 N.Y.S.2d 4, 5, 8 (N.Y. App. Div. 2002)). "In construing New York law," the Second Circuit wrote, "we are bound . . . by the law of New York as interpreted by the New York Court of Appeals, and we consider the language of [state intermediate appellate] courts to be helpful indicators of how the state's highest court would rule." *Id.* at 221 (internal quotation marks omitted).

      Finding no "contrary authority in New York that diverges from the holding in *Roundabout Theatre*" and no "persuasive evidence that the highest state court would reach a different conclusion from *Roundabout Theatre*," the court in *10012 Holdings* held that "direct physical loss of or damage to" property does not include "mere loss of use of a premises, where there has been no physical damage to premises." *Id.* at 221–22 (internal quotation marks omitted); *see, e.g., BR*

---

[18] The insurance policy in *Roundabout Theatre* "did not contain a civil authorities extension"—which would presumably have provided coverage based on the facts alleged in *Roundabout Theatre*. 751 N.Y.S.2d at 9. "[I]n fact[,] it included a governmental authority exclusion." *Id.*

*Rest. Corp. v. Nationwide Mut. Ins. Co.*, No. 21-2100-CV, 2022 WL 1052061 (2d Cir. Apr. 8, 2022) (concluding based on *10012 Holdings* and *Roundabout Theatre* that a policyholder that had not alleged physical damage to its property had not shown it was entitled to coverage for income loss resulting from New York's restrictions on on-premises dining).

While *10012 Holdings* and *BR Restaurant Corp.* did not involve a claim for coverage due to alleged COVID-19 virus contamination on the plaintiff's property, the Second Circuit did encounter that type of claim in *Kim-Chee LLC v. Philadelphia Indemnity Insurance Co.*, No. 21-1082, 2022 WL 258569 (2d Cir. Jan. 28, 2022). There, the Second Circuit affirmed the district court's dismissal of the case, "agree[ing] with the district court that the virus's inability to physically alter or persistently contaminate property differentiates it from radiation, chemical dust, gas, asbestos, and other contaminants whose presence could trigger coverage under [the plaintiff's] policy." *Id.* at *2–3.

The district court's opinion had examined in detail cases from other jurisdictions issued prior to COVID-19 that had addressed claims for property insurance coverage due to contamination from non-viral sources; the court concluded that the presence of the COVID-19 virus on property was more akin to "the easily remedied intrusion of road dust," a "temporary" substance that "does not prevent use of the structure" and thus does not cause "direct physical loss of or damage to" property, than it was to "the persistent hazard of gasoline seepage" that "render[s] [the property] unusable because of the risk of fire or explosion." *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, 535 F. Supp. 3d 152, 160–61 (W.D.N.Y. 2021), *aff'd*, 2022 WL 258569 (comparing *Mama Jo's, Inc. v. Sparta Ins. Co.*, 823 F. App'x 868 (11th Cir. 2020), *cert. denied*, 141 S.Ct. 1737 (2021) (intrusion of road dust) with *Western Fire Ins. Co. v. The First Presbyterian Church*, 437 P.2d 52 (Colo. 1968) (gasoline seepage)). *See also Stetson Real Estate LLC v. Sentinel Ins.*

*Co.*, No. 20-8902, 2022 WL 2441576, at *5 (July 5, 2022) (discussing cases where "particulate matter resulting from the collapse of the World Trade Center penetrated the covered property and settled in its mechanical and electrical systems, causing physical damage," and where "the presence of large quantities of asbestos in the air of a building . . . made the structure uninhabitable and unusable," and concluding that "by contrast," the plaintiff in *Stetson* had not alleged "that COVID-19 penetrated the property or rendered it uninhabitable"). The analysis by the district courts in *Kim-Chee* and *Stetson*, which in *Kim-Chee* was affirmed by the Second Circuit, suggests that New York also recognizes that "direct physical loss of or damage to" property can occur without material alteration of the property if a physical substance causes the property to become totally uninhabitable and unusable.

The New York Appellate Division has also decided a COVID-19 business interruption insurance case in which the plaintiff asserted that COVID-19 is analogous to substances like asbestos and "inflicts physical damage on property, even if such damage is invisible or intangible." *Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 167 N.Y.S.3d 15, 19 (N.Y. App. Div. 2022). Like the Second Circuit in *10012 Holdings*, the state court in *Consolidated Restaurant Operations* considered *Roundabout Theatre* instructive and concluded that under *Roundabout Theatre*, "direct physical loss of or damage to" property requires a visible or tangible alteration to the material dimensions of the property, and "the impaired function or use of [] property for its intended purpose[] is not enough." *Id.* at 21. Thus, the court affirmed the dismissal of the plaintiff's claim that virus particles present on its property physically altered the property even if not in a materially discernable away. *See id.* at 18–19.

While consistent with Second Circuit cases in concluding that "direct physical loss of or damage to" occurs when property is tangibly altered, *Consolidated Restaurant Operations* differs

from the Second Circuit's decision in *Kim-Chee* (as well as the district court decisions in *Kim-Chee* and *Stetson*) on the issue of whether "direct physical loss of or damage to" property can exist without material alteration. In *Consolidated Restaurant Operations*, the New York Appellate Division appears to hold that under New York law, "direct physical loss of or damage to" property *only* occurs when there is "a negative alteration in the tangible condition of the property" and does not occur when conditions rendering property uninhabitable and unusable exist. *Id.* at 22–23 (concluding that cases cited by the plaintiff for the premise that physical damage to property can occur without structural alteration conflicted with New York law that "a negative alteration in the tangible condition of the property [insured] is necessary in order for there to be a physical damage to the property" (alteration in original) (internal quotation marks omitted)).

In sum, as with Illinois, New York is a jurisdiction involved in this MDL within which there exist both state intermediate appellate court decisions and federal Court of Appeals decisions that are for the most part consistent and suggest that the New York Court of Appeals would decide the issue the same way. *See Lupu*, 903 F.3d at 389.

**West Virginia.** The Fourth Circuit's opinion in *Uncork & Create LLC v. Cincinnati Insurance Co.*, 27 F.4th 926 (4th Cir. 2022), like *Sandy Point* and *10012 Holdings*, is also based in large part on that Court of Appeals' interpretation of case law from the highest court of West Virginia, the state whose law applied in that case. In *Uncork & Create*, the plaintiff argued that *Murray v. State Farm Fire & Casualty Co.*, 509 S.E.2d 1 (W. Va. 1998), supported the plaintiff's claim that it had suffered "physical loss" to its property despite the absence of structural damage to the property. 27 F.4th at 930. The West Virginia Supreme Court of Appeals held in *Murray* that three homes that were positioned next to an eroding 50-foot high wall made of boulders and rocks had all experienced "direct physical loss," even though only two of the homes had been hit by

falling boulders and rocks, because of the "imminent threat of material damage" that the boulders and rocks presented and which made all of the homes uninhabitable. *Id.* at 932–33 (citing *Murray*, 509 S.E.2d at 4–5, 17)).

In *Uncork & Create*, the Fourth Circuit concluded that "direct physical loss of or damage to" property requires a material alteration to the property, and the court viewed *Murray* as consistent with that conclusion: "The holding in *Murray* that all three homes suffered damage was based on the present or imminent threat of material damage that rendered all three homes uninhabitable. . . . To the extent that the state court addressed the plaintiffs' inability to use their homes, that loss inextricably was tied to the impending physical damage to all three homes." *Id.* at 933. Notably, unlike *Sandy Point* and *Kim-Chee*—which indicate that under Illinois and New York law, "direct physical loss of or damage to" property can exist *without* a present or impending material alteration to property if a physical substance renders the property totally uninhabitable and unusable—*Uncork & Create* does not discuss such a possibility when West Virginia law applies.

**Ohio**. The Sixth Circuit predicted the meaning of the phrase "direct physical loss of or damage to" property under Ohio law in *Santo's Italian Café LLC v. Acuity Insurance Co.*, 15 F.4th 398 (6th Cir. 2021), and *Bridal Expressions LLC v. Owners Insurance Co.*, No. 21-3381, 2021 WL 5575753 (6th Cir. Nov. 30, 2021), also basing its analysis on intermediate appellate court decisions within Ohio. According to the Sixth Circuit, "a direct physical alteration of the property [is] needed to show 'damage to' it, and some form of complete destruction or dispossession was needed to show 'loss of' the property." *Bridal Expressions*, 2021 WL 5575753, at *1 (citing *Santo's*, 15 F.4th at 401).

In both *Santo's Italian Café* and *Bridal Expressions*, the plaintiff had claimed that it

suffered "direct physical loss of or damage to" its property based on the Mandated Shutdown Rules—and in both cases, the Sixth Circuit rejected that claim. "The Governor's shut-down orders [] did not create a direct physical loss of property or direct physical damage to it. They simply prohibited one use of the property—in-person dining—while permitting takeout dining and through it all did not remotely cause direct physical damage to the property." *Santo's Italian Café*, 15 F.4th at 402; *see also Bridal Expressions*, 2021 WL 5575753, at *2 ("Throughout the coverage period, [the plaintiff] retained possession of its property and could put it to use. The company's inability to use the property in the same way as it did before the pandemic . . . does not satisfy the policy's language."). The court noted in *Santo's Italian Café* that Ohio case law supports its reading of the phrase "direct physical loss of or damage to" property. 15 F.4th at 403 (citing *Mastellone v. Lightning Rod Mutual Ins. Co.*, 884 N.E.2d 1130, 1143–44 (Ohio Ct. App. 2008), which concluded that mold grown was not "physical loss to property" because it "did not adversely affect[] the structural integrity of the house" (alteration in original) (internal quotation marks omitted)).

In *Bridal Expressions*, the plaintiff also alleged that the COVID-19 virus caused "direct physical loss of or damage to" its property. The Sixth Circuit concluded that the plaintiff had not pleaded sufficient plausible facts to support that theory, but it did not decide whether such a claim, if pleaded differently, would have merit. *See Bridal Expressions*, 2021 WL 5575753, at *2 ("For this theory to have traction, the complaint would need to allege at a minimum that the coronavirus was present in the store and materially altered specific property at the time. If that were the theory of coverage, moreover, the complaint presumably would seek coverage for replacing that property and only for the time that property was damaged or lost. . . . But [the complaint] merely[s] say in the abstract that the virus could alter physical property somehow, noting how biological agents might render products impure and how the virus might spread person-to-person through the air

and on surfaces. [The plaintiff] never tied those points to its store.").

     *Maryland.* Finally, in *Cordish Cos., Inc. v. Affiliated FM Insurance Co.*, No. 21-2055, 2022 WL 1114373 (4th Cir. Apr. 14, 2022), the Fourth Circuit affirmed the decision by the district court, which, applying Maryland law, concluded that "[t]he inclusion of the modifier 'physical' in the phrase 'physical loss or damage' unambiguously requires some form of material alteration to the property that has experienced 'loss or damage,'" *Cordish Cos., Inc. v. Affiliated FM Ins. Co.*, 573 F. Supp. 3d 977, 997 (D. Md. 2021), *aff'd*, 2022 WL 1114373 (citing *Merriam-Webster*'s and *Black's Law Dictionary*'s definitions of "physical," and citing 10A Steven Plitt et al., Couch on Insurance § 148:46 (3d ed. 2021)). The district court determined that "no Maryland State court has opined on the meaning of th[e] precise phrase ['physical loss or damage'] in a reported opinion." *Id.* at 997. Without guidance from Maryland state courts, the court in *Cordish Cos.* considered "the broader context of the policy," specifically a clause in the policy equivalent to the "period of restoration" clause in the Erie Policies at issue in this MDL, to be an indication that "the covered property must have suffered some tangible harm to qualify for coverage." *Id.* at 998–99.

     The *Cordish Cos.* court also discussed cases that have held that "direct physical loss of or damage to" property occurred despite no tangible alteration to the property and concluded that the plaintiff had not alleged circumstances that were present in those cases. *Id.* at 999–1000 (citing *Port Auth. of NY & NJ v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002); *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95 (E.D. Pa. 2020); *Nat'l Ink & Stitch, LLC v. State Auto Prop. & Cas. Ins. Co.*, 435 F. Supp. 3d 679 (D. Md. 2020)) (explaining that in all of those cases, direct physical loss to property occurred because the properties were rendered uninhabitable and unusable). In doing so, the district court in *Cordish Cos.* acknowledged the possibility of coverage stemming from loss or damage that does not materially alter the property,

but the court ultimately concluded that the plaintiff had not made that showing. *See id.* at 1000 ("In contrast [to *Port Authority*, *Brian Handel*, and *National Ink & Stitch*], the Complaint does not allege that Cordish's properties sustained any alteration *or change*, much less one that rendered them unusable as a result of the virus." (emphasis added)).

Based on its analysis of the plain meaning of the phrase "direct physical loss of or damage to" property and of cases that have interpreted similar phraseology in COVID-19 as well as pre-COVID-19 contexts, the *Cordish Cos.* court granted the defendant's motion to dismiss the plaintiffs' claims for coverage, concluding that the plaintiff had not demonstrated the threshold "direct physical loss of or damage to" its property. *See id.* at 1106. The Fourth Circuit "reviewed the record and f[ound] no reversible error" and affirmed. 2022 WL 1114373, at *1 (citing *Uncork & Create*, 27 F.4th at 933–34, in which the Fourth Circuit held that under West Virginia law, policyholders could not demonstrate coverage for business losses resulting from COVID-19).

***Other Relevant Jurisdictions***. In the District of Columbia, Pennsylvania, and Tennessee, there are no decisions by the jurisdiction's highest court or intermediate appellate court, or by a federal Court of Appeals applying that jurisdiction's law, that speak to whether COVID-19 or the related Mandated Shutdown Rules constitute "direct physical loss of or damage to" property, but other case law is persuasive as to how that jurisdiction's highest court would rule.

Tennessee is located within the Sixth Circuit; as discussed above, the Sixth Circuit has decided cases addressing this issue under Ohio law, concluding that "direct physical loss of or damage to" property requires a "physical alteration of the property" or "complete destruction or dispossession of" the property, *Bridal Expressions*, 2021 WL 5575753, at *1 (citing *Santo's Italian Café*, 15 F.4th at 401). Erie argues in its Motion to Dismiss that those Sixth Circuit decisions "apply with equal weight to Tennessee" because the decisions "are not based on Ohio-specific

case law or jurisprudence." (ECF No. 239, at 42 n.11.)

As explained in this Opinion, the law of insurance contract interpretation in all jurisdictions whose law applies to the actions in this MDL is largely identical in each of those jurisdictions. That means that the Sixth Circuit's analysis of the "ordinary meaning" of the phrase "direct physical loss of or damage to" property and the surrounding language in the policies at issue in the cases, as well as "the traditional uses of commercial property insurance" recognized by Ohio courts, *Santo's Italian Café*, 15 F.4th at 400–04, reflects the application of principles of insurance contract interpretation that generally apply not just in Ohio, but also in Tennessee (and in the other jurisdictions involved in the MDL). *See, e.g.*, *Agilitas USA Inc. v. Hartford Fire Ins. Co.*, No. 3:21-CV-00094, 2021 WL 5084577, at *6 (M.D. Tenn. Nov. 2, 2021) (applying *Santo's Italian Café* to resolve parallel claims under Tennessee law). *Santo's Italian Café* and *Bridal Expressions* are persuasive authorities on the issue of the meaning of "direct physical loss of or damage to" property and application to these facts under Tennessee law.

Pennsylvania is within the Third Circuit, and our Court of Appeals has not yet decided a COVID-19 business interruption insurance case,[19] but it has issued precedential and non-precedential decisions in cases involving an insurance claim for expenses incurred from the abatement of asbestos-containing materials, *see Port Auth. of NY & NJ v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002), and an insurance claim stemming from vacating of a home in which the water supply was contaminated with *E. coli* bacteria, *see Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005). While *Port Authority* and *Hardinger* examined the meaning

---

[19] The Third Circuit heard argument in fourteen consolidated COVID-19 business interruption insurance cases on September 28, 2022, *Rhonda Wilson v. USI Insurance Services LLC*, No. 20-3124, ECF No. 142, at 2 (Sept. 8, 2022), and that court has stayed the resolution of other similar appeals that have not been consolidated with those set to be argued pending the resolution of the consolidated cases before it or until further order of that court, *Wilson*, No. 20-3124, ECF No. 43, at 2 (April 6, 2021).

of "direct physical loss of or damage to" property outside of the COVID-19 context, their analysis is helpful for predicting how Pennsylvania courts would decide cases like those in this MDL.[20]

In *Port Authority*—as in *Sandy Point*, *Kim-Chee*, *Cordish Companies*, and *Bridal Expressions*—the court concluded that "direct physical loss of or damage to" property usually requires "a distinct, demonstrable, and physical alteration" of the property, and when the cause of the asserted loss or damage is "unnoticeable to the naked eye," it only constitutes direct physical loss or damage if the "function [of the property] is nearly eliminated or destroyed, or the structure is made useless or uninhabitable." 311 F.3d at 235–36. Based on that principle, the Third Circuit agreed with the district court that for "physical loss or damage" to occur from asbestos fibers, there must be "contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility," and that "[t]he mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id.* at 236.

The Third Circuit concluded that this outcome was consistent with the purpose of "all risk" property insurance policies and did not stretch the policies beyond that purpose. *See id.* at 234–36 ("It is worthy of note . . . that in the insurance industry, 'all risks' does not mean 'every risk.' . . . The requirement that [] contamination [by a source invisible to the naked eye] reach such a level in order to come within coverage [] establishes a reasonable and realistic standard for identifying physical loss or damage. . . . A less demanding standard . . . would not comport with the intent of a first-party 'all risks' insurance policy, but would transform it into a maintenance contract.").

---

[20] While *Port Authority* involved New York and New Jersey law, and not Pennsylvania law, the panel of the Third Circuit in *Hardinger*, which involved Pennsylvania law, relied on *Port Authority* because the panel stated, "[w]e find nothing . . . in New York, New Jersey, or Pennsylvania law that would cause us to disregard *Port Authority* under Pennsylvania law." *Hardinger*, 131 F. App'x at 826.

The panel in *Hardinger* concluded that, based on *Port Authority*, there was a genuine issue of fact in *Hardinger* as to whether *E. coli* in the water supply for a home caused physical loss of the property. 131 F. App'x at 826–27. "While . . . asbestos presents unique concerns," the court nonetheless found *Port Authority*'s treatment of asbestos-related claims instructive: asbestos, like *E. coli*, is a physical substance unnoticeable to the naked eye, and *Port Authority* had explained that in cases in which "direct physical loss of or damage to" is alleged to have been caused by such a source, such loss or damage can be shown if "use of the property [is reduced] to a substantial degree," *i.e.*, if "the functionality of the [property] [is] nearly eliminated or destroyed." *Id*. On the record before the panel in *Hardinger*, it was disputed whether the impact to the homeowner's property rose to that level—*i.e.*, rendered the property completely useless and uninhabitable—and the panel reversed the district court's grant of summary judgment in favor of the insurer in part on that basis. *See id.*[21]

Finally, the District of Columbia Superior Court addressed the meaning of "direct physical loss of or damage to" property under District of Columbia law in *Rose's 1, LLC v. Erie Insurance Exchange*, No. 2020-2424, 2020 WL 4589206 (D.C. Super. Aug. 06, 2020). There, the court

---

[21] *Cooper v. Travelers Indemnity Co.*, No. 01-2400, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002), is another pre-COVID-19 pandemic case that considered a claim for insurance coverage based on the presence of *E. coli* in the property's water supply. While the law of California is not involved in any action in this MDL, the Court finds this case instructive as to whether, and if so, how, COVID-19 differs from *E. coli* in terms of impact on property, and the Court describes the case here to aid in its analysis below.

In *Cooper*, the plaintiff owned property on which the plaintiff operated a restaurant, and the plaintiff had a commercial property insurance policy with the defendant to insure the restaurant against "direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss." *Id.* at *1–2. "The source of water for the buildings on the property was a well located on the property"; "[o]n February 13, 1999, water from the well tested positive for the presence of [*E. coli*]," and "[c]ounty health authorities ordered the closure of the tavern due to the [*E. coli*] contamination of the well." *Id.* at *1. The plaintiff "made repeated, but ultimately unsuccessful, efforts to disinfect the well," and the defendant hired "a firm of water and sewer experts" to determine the possible causes of the contamination. *Id.* at *1–2. The plaintiff ultimately "had a new well installed on the property in a location unaffected by the contamination," after which he reopened the restaurant that he operated on the property. *Id.* at *2. The plaintiff sued its insurer when his claims were denied, and the court ruled for the plaintiff, concluding that "the closure of the tavern . . . was a necessary suspension of [the plaintiff's] operation of the tavern that resulted from direct physical damage to the property at the insured premises." *Id.* at *5.

concluded that the District of Columbia Court of Appeals' decision in *Brothers, Inc. v. Liberty Mutual Fire Insurance Co.*, 268 A.2d 611 (D.C. 1970), "support[s] the proposition that, in the context of property insurance, the term 'direct loss' requires some sort of direct physical change to the insured property." *Id.* at \*4. In *Brothers*, the District of Columbia Court of Appeals had examined the meaning of "direct loss" caused by "riot" or "civil commotion," and "interpreted the term 'direct loss' in the contract to mean 'a loss proximately resulting from physical damage to the property or contents caused by a riot or civil commission." *Id.* (citing *Bros., Inc.*, 268 A.2d at 613). The Superior Court concluded that *Brothers, Inc.* "support[s] the position that, in the context of property insurance, the term 'direct loss' implies some sort of direct physical change to the insured property. *Id.*

The above-summarized decisions by courts located within or applying the law of the jurisdictions involved in this MDL (with the exception of the Pennsylvania Courts of Common Pleas decisions in *Ungarean*, 2021 WL 1164836; *MacMiles, LLC v. Erie Insurance Exchange*, No. GD-20-7753, 2021 WL 3079941 (Pa. Ct. Com. Pl. May 25, 2021); and *Brown's Gym, Inc. v. Cincinnati Insurance Co.*, No. 20-CV-3113, 2021 WL 3036545, (Pa. Ct. Com. Pl. July 13, 2021), cited extensively by Plaintiffs) have reached results consistent with the decisions in the majority of COVID-19 business interruption insurance cases that have been filed in state and federal courts. *See COVID Coverage Litigation Tracker*, Univ. of Penn. Carey Law School: Insurance Law Center, https://cclt.law.upenn.edu/ (last visited Oct. 13, 2022).

From the case law as summarized above, this Court concludes that in all jurisdictions whose law applies to the actions in this MDL, "direct physical loss of or damage to" property occurs when a structural alteration to property is evident and that alteration requires that the affected property be repaired, rebuilt, or replaced before the property can be used again. In

addition, in most of those jurisdictions, "direct physical loss of or damage to" property also occurs when property is not structurally damaged but is impacted by a physical substance to such a degree that the property is uninhabitable and unusable until the impact is affirmatively ameliorated. With the exception of the state trial court decisions in *Ungarean*, *MacMiles*, and *Brown's Gym*, the cases discussed above have uniformly rejected claims that either the COVID-19 virus or the Mandated Shutdown Rules issued in response to the pandemic causes "direct physical loss of or damage to" property, concluding that the plaintiffs in those cases had not shown either that a tangible alteration to their property occurred or that their property was rendered uninhabitable and unusable.

### iv.   Whether Plaintiffs Have Plausibly "Shown" in the CAC "Direct Physical Loss of or Damage to" Their Property that Triggers Coverage

The near-uniform dismissal of claims like Plaintiffs' in the above-summarized cases applying the law of the jurisdictions involved in this MDL presents an uphill precedential path for Plaintiffs. The central question here is whether it appears to the Court that those decisions—from Virginia's highest court and from courts applying the law of the other eight jurisdictions involved in this MDL—were correct predictions of how the involved jurisdiction's highest court would decide claims that mirror those of Plaintiffs (as to the non-Virginia jurisdictions) or involved fundamentally different factual allegations or legal arguments than those that Plaintiffs have advanced here.

The Court first observes that there is not a persuasive basis advanced for this Court to conclude that the above-summarized cases were not soundly decided and are not reliable indicators of the path of the decisional law which this Court should follow as to how the highest courts of the jurisdictions whose law applies in this MDL would decide the issues raised in these actions—most importantly, the meaning of "direct physical loss of or damage to" property and application of that phrase in the COVID-19 business interruption insurance litigation context. *See Lupu*, 903 F.3d at

389; *Mellon Bank*, 999 F.2d at 796; *Ehrenfelt*, 737 F. App'x at 265; *Dawn Equip.*, 186 F.3d at 989 n.3; *Abex Corp.*, 790 F.2d 125–26; *Jones Truck Lines*, 1989 WL 49517, at *5.

Virginia is the only jurisdiction whose highest court has weighed in on that issue, but the federal Courts of Appeals' decisions in *Sandy Point* (Illinois law), *10012 Holdings* (New York law), *Uncork & Create* (West Virginia law), and *Santo's Italian Café* (Ohio law) as well as the progeny of those Courts of Appeals decisions all relied on decisions by the involved states highest courts or intermediate appellate courts that had interpreted similar property insurance policy language in other contexts and drew reasonable conclusions based on those cases.

Further, in Illinois and New York, intermediate appellate courts have decided the meaning of "direct physical loss of or damage to" property and its application in cases like those in this MDL. And as for the remaining jurisdictions, the Court is persuaded by the reasoning of available cases involving COVID-19 business interruption insurance claims or analogous contexts, as discussed above. Further, the law in all of the jurisdictions involved in the MDL as to how courts should interpret the phrase "direct physical loss of or damage to" property is substantially the same, such that the reasoning of federal Courts of Appeals in cases based on one jurisdiction's law, for example, is also highly instructive as to the outcome of a similar case in another jurisdiction.

The Court also concludes that the factual allegations and legal arguments advanced by Plaintiffs in the CAC and the advocacy in opposition to the Motion to Dismiss are not materially different from such as advanced by the plaintiffs in the above-summarized decisions and thus that those decisions are properly instructive in this Court's analysis of Plaintiffs' claims and the Motion that seeks to dismiss them.

As to Plaintiffs' claims and supporting factual allegations, Plaintiffs' primary claim is that the COVID-19 virus is a covered cause of loss because it is a physical substance that caused "direct

physical loss of or damage" to Plaintiffs' properties; while Plaintiffs' have also argued during this litigation that the Mandated Shutdown Rules are a covered cause of loss in and of themselves, Plaintiffs have firmly steered away from that argument ever since making it.[22] In support of their primary claim, Plaintiffs' CAC does go further in its factual allegations than some of the complaints by plaintiffs in the leading cases that this Court has discussed in this Opinion. For example, unlike the plaintiff in *Sandy Point* and some of the other cases discussed above, Plaintiffs here have alleged that COVID-19 virus particles were physically present on their properties and that the particles altered the properties by bonding to surfaces and "becom[ing] part of th[ose] surface[s]." (ECF No. 228 ¶¶ 119, 192–95.) *See Sandy Point*, 20 F.4th at 335. Plaintiffs have also cited to several studies that have concluded that COVID-19 virus particles remain stable, transmittible, and/or infectious in air and on surfaces for a certain length of time, and according to one of those studies for up to nine days on certain surfaces. (*Id.* ¶¶ 121–22.)

But these allegations do not carry the day for Plaintiffs, for many of the same reasons explained by courts addressing such factual allegations by other plaintiffs in other COVID-19 business interruption insurance cases, *see, e.g.*, *State & 9 St. Corp.*, 2022 WL 2379361, at *7, *Kim-Chee*, 2022 WL 258569, at *2–3, *Bridal Expressions*, 2021 WL 5575753, at *2, which the Court now highlights and expands on.

To begin, even considering on their own and accepting as true Plaintiffs' allegations that the virus particles can become affixed to and remain stable on surfaces for 3 or 4 hours or for 1, 2, 3, 9, or 14 days, and in that way "change" the surfaces (ECF No. 228 ¶¶ 119, 121, 122, 127),[23] the

---

[22] See footnote 12.

[23] Plaintiffs' assertion that the change to their properties, in the form of chemical bonds that allegedly formed between COVID-19 and surfaces on the property (and present only until the natural dissipation or standard cleaning noted above and below), constitutes "direct physical loss of or damage to" that property is a legal conclusion that the Court is to set aside in evaluating a complaint on a motion to dismiss. *See Malleus*, 641 F.3d at 563 (explaining that a court must "strike conclusory allegations" from a complaint in deciding a motion to dismiss).

natural plausible inference from those allegations is that the virus particles dissipate on their own, after those numbers of hours or days have passed, without any human intervention. Based on those allegations, the impact that COVID-19 virus particles have on property on which it is present is wholly unlike the impact that, say, a fire that burns all or part of a structure has on property where a fire has occurred.

In the former situation, virus particles allegedly cause a change to property by introducing a new substance on the surfaces or in the air within the property, but any change, as Plaintiffs' themselves plead and acknowledged at argument, is transitory and self-limiting—and based on those same allegations, no affirmative action by anyone is required to return the property to its original state. In the latter situation, a fire causes a fundamental change to property by burning it, and the change is permanent until affirmative steps are undertaken to rebuild, repair, or replace the damaged property.

The same comparison applies as to other substances that have been found to cause "direct physical loss of or damage to" property even if the property itself remains intact; for instance, unlike the example often used in COVID-19 business interruption decisions of gasoline that has accumulated in the soil around and under a building, continuing to do so until "the premises became so infiltrated and saturated as to be uninhabitable" due to the highly dangerous situation posed by the gasoline, *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968), Plaintiffs expressly plead in the CAC that COVID-19 particles dissipate relatively quickly without external intervention (*see* ECF No. 228 ¶¶ 119, 121, 122, 127).

Next, a reading of Plaintiffs' CAC as a whole also requires the Court to also accept as true Plaintiffs' assertion in the CAC that "some cleaning products will both inactivate and remove COVID-19 from surfaces." (ECF No. 228 ¶ 120.) This assertion demonstrates that the virus

particles can be readily removed, thus returning the property to its original condition, as soon as the property owners themselves undertake simple cleaning actions in advance of its natural dissipation. In this way, COVID-19 is distinguishable from, for example: (1) asbestos fibers that have been released from a structure, requiring asbestos professionals to repair the asbestos-containing material or remove the asbestos from the structure, *see Port Auth.*, 311 F.3d at 236; *Protect Your Family from Exposure to Asbestos*, EPA, https://www.epa.gov/asbestos/protect-your-family-exposures-asbestos#whattodo (last updated Mar. 28, 2022); (2) *E. coli* that has contaminated the water supply of a home or a business to such a degree as to make the water supply, and thus the property, wholly useless until a new distinct water supply can be created, *see Hardinger*, 131 F. App'x at 825–87, *Cooper*, 2002 WL 32775680 at *1–2; and (3) ammonia that has been released into a building, requiring a remediation company to dissipate the ammonia from the building, *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 12-04418, 2014 WL 6675934, at *1–2 (D.N.J. Nov. 25, 2014). "In such cases, the non-structural damage would require non-routine, extensive remediation," unlike the situation presented by COVID-19, which, as Plaintiffs themselves have pleaded, "can be eliminated by routine cleaning and disinfecting." [24] *Sharde Harvey, DDS, PLLC v. Sentinel Ins. Co., Ltd.*, No. 20-3350, 2021 WL 1034259, at *9 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted*, No. 20-3350, 2022 WL 558145 (S.D.N.Y. Feb. 24, 2022) (internal quotation marks omitted) (analyzing pre-COVID cases cited by the plaintiff "where non-structural damage was held to be a loss of or damage to property" and

---

[24] The Vermont Supreme Court recently reversed a trial court's order granting judgment on the pleadings against a policyholder who sought business interruption coverage for losses it suffered because of the COVID-19 pandemic. *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, No. 2021-173, 2022 WL 4396475 (Vt. Sept. 23, 2022). In reaching this decision, the Court relied on the fact that the "insured [company] alleged it took steps beyond mere cleaning in order to remediate the alleged damage COVID-19 caused to its property." Id. at *12 (emphasis added). The reasoning of the Vermont Supreme Court in *Huntington* is therefore not inconsistent with the reasoning in the asbestos, *E. coli*, and ammonia decisions, which all required repair beyond "mere cleaning." In contrast, the Plaintiffs here have pleaded that the COVID-19 virus is both transient and able to be removed with ordinary cleaning supplies.

explaining why in those cases "the non-structural damage was different in kind from the presence of COVID-19" (internal quotation marks omitted)).

Thus, considered either separately or together, Plaintiffs' pleadings as to (1) the relatively short amount of time that COVID-19 virus particles may alight and then remain on property on which they are found and (2) the ability for property owners themselves to use readily available cleaning products to easily "inactivate and remove" the virus particles from surfaces does not demonstrate "the presence of a factual situation" that constitutes direct physical loss of or damage to property as that phrase has been defined in commercial property insurance litigation. *Doug Grant*, 232 F.3d at 184. And considered as a whole, Plaintiffs' assertions do not "show" "a distinct, demonstrable, and physical alteration" of the involved property, such that "its function is nearly eliminated or destroyed, or . . . made useless or uninhabitable," the test as articulated by the court in *Port Authority*. 311 F.3d at 235–36. Plaintiffs' emphasis on the danger that COVID-19 poses to human health and its capacity to spread, such that it is "nearly impossible" to eradicate and such that any amount of time that COVID-19 is present before it is eradicated is a dangerous situation does not help the CAC survive a motion to dismiss, because it does not plausibly show that *property* where COVID-19 is present has been rendered totally useless and uninhabitable. And in the Court's judgment, the Plaintiffs' statement that "[b]ased upon the available data, Plaintiffs believe and aver that COVID-19 was present on the premises of their Covered Properties", (ECF No. 228 at ¶ 192), falls short of supporting that assertion, given its conclusory nature and its reliance on the unsupported premise that because there was "no specific way to test for COVID-19 on surfaces", (*id.* at ¶ 191), the virus, in essence, should therefore be treated as necessarily having been present on such surfaces on the basis that it could not be tested to be otherwise.

In addition, the further matters that Plaintiffs have pleaded in an effort to show that

COVID-19 was physically present on their particular properties are not sufficient to plausibly make that showing. That is because the allegations that some Plaintiffs "had one or more employees or customers report that they tested positive for COVID-19" and/or "had employees or customers who reported being exposed to COVID-19 and/or quarantined because of exposure to COVID-19" (ECF No. 228 ¶ 194) do not in the Court's judgment plausibly "show" that those employees or customers were exposed to COVID-19 *from* the Plaintiffs' properties or that they spread COVID-19 virus particles *onto* the properties. At most, these allegations show that people who were at some point infected with COVID-19 were at some point present on the involved premises. Those allegations do not plausibly "show" that the virus was physically on any surface or element of the involved physical property

Plaintiffs allege and have emphasized that COVID-19 infection can lead to long-term, detrimental health effects and even death (ECF No. 228 ¶ 116) and that close physical proximity between people increases the risk that COVID-19 will be transmitted between them (*id.* ¶¶ 125–29), and thus, Plaintiffs' properties became "unsafe and unstable for occupancy and/or intended use" (*id.* ¶ 193). The Court does not dispute Plaintiffs' characterization of the COVID-19 virus as dangerous to the physical health of those who encounter it; the virus has taken an immeasurable toll on *people* who have been infected. But the Court, like all who have lived through the COVID-19 pandemic, is also aware that a significant number of physical properties—whether it be grocery stores or hospitals that remained open, operable and operating throughout the pandemic to provide essential services—were (1) either as likely as Plaintiffs' properties to have been impacted by the same COVID-19 virus, to the extent that the virus was allegedly present on Plaintiffs' properties and yet (2) never ceased to be fit to be inhabited. Despite the assumed presence of COVID-19 virus particles on such properties at which essential businesses were operated (based on the logic

relied upon by the Plaintiffs), those properties continued to be while the inhabitants of those properties employed other mitigation efforts that Plaintiffs identify in their CAC, like mask wearing, to reduce the impact of COVID-19 on those inhabitants. In short, the COVID-19 virus did not harm those properties in a way so as to generate a loss of or to the property itself, and Plaintiffs have not plausibly pleaded that the situation at their properties was or would be any different.

In other words, Plaintiffs' allegations that their properties were rendered useless or uninhabitable is implausible considering all of the allegations of the CAC and the relevant common knowledge and experience. *See Bookwalter*, 946 F.3d at 177 (citing *Iqbal*, 556 U.S. at 679) (requiring a court evaluating a motion to dismiss to "draw on its judicial experience and common sense"); *Cordish Cos.*, 573 F. Supp. 3d at 1000 (quoting *Uncork & Create*, 498 F. Supp. 3d at 883) ("To be sure, factual allegations drive the analysis of a motion to dismiss, but courts are not required to set aside common sense." (internal quotation marks and alteration omitted)). "Under the broadest interpretation of ["direct physical loss or damage"], the Court finds that where Plaintiff[s] allege[] that the coronavirus disease caused 'direct physical loss' to its premises under the terms of the Polic[ies], Plaintiff[s] must plead that the premises were infiltrated, saturated, or so overwhelmed by a chemical or biological agent (in this case, COVID-19 particles) as to render it uninhabitable and make use of the building dangerous." *Albuquerque Ambulatory Eye Surgery Ctr. LLC v. Transp. Ins. Co.*, 566 F. Supp. 3d 1178, 1193 (D.N.M. 2021). Plaintiffs have not done so and based on their own allegations regarding the inherently transitory nature of any physical presence of the COVID-19 virus on surfaces and the ease with which it is removed, could not do so.[25]

---

[25] The nature of COVID-19 as pleaded in Plaintiffs' CAC shows why COVID-19 is distinct from other physical but invisible substances that courts have concluded cause physical loss of property without structurally altering the

Nor do Plaintiffs' assertions about the Mandated Shutdown Rules demonstrate that COVID-19 rendered property so dangerous such that it was unusable and uninhabitable. Unlike government regulations or orders requiring a property owner to abate asbestos fibers when present on the property in certain amount, *Port Auth.*, 245 F. Supp. 2d at 573, or close the property due to the hazard generated by presence of gasoline in the soil surrounding a particular building, *First Presbyterian Church*, 437 P.2d at 54, or close the property due to *E. coli* contamination of the property's water supply, *Cooper*, 2002 WL 32775680, at *1, the Mandated Shutdown Rules were not directed at any particular property in response to the confirmed presence of COVID-19 on the surface of the property. Instead, they were directed at businesses state-wide in response to the emergence and spread of COVID-19 throughout communities and for the purpose of reducing that spread by reducing the frequency of people congregating in public spaces by restricting the inhabitation of the property. (*See, e.g.*, ECF No. 228 ¶ 133 ("[O]n March 15, 2020, Governor Wolf [of Pennsylvania] announced that mitigation efforts were being put into place starting on March 16, 2020, closing certain businesses such as restaurants and bars to the public, to help stop the spread of COVID-19."); ¶ 140 ("[O]n March 16, 2020, Governor Pritzker [of Illinois] announced that, starting that same day, mitigation efforts were being put into place, requiring all businesses that offered 'food or beverages for on-premises consumption' to cease such service and prohibiting all public and private gatherings of 50 people or more.").)

---

property; while COVID-19 may have led to Mandated Shutdown Orders that limited *how* property owners use their properties, substances like gasoline, asbestos fibers, *E.coli*, and ammonia, under the circumstances that existed in the cases involving those substances, in and of themselves prevented *any* use of the properties at which they were present. Thus, unlike the court in *Brown's Gym*—another Pennsylvania Court of Common Pleas case on which Plaintiffs rely— this Court cannot reasonably conclude that the facts that Plaintiffs have pleaded plausibly show "direct physical loss of or damage to" property simply because courts have found such loss or damage to exist under other circumstances, involving other invisible substances, that are not present here. *See* 2021 WL 3036545, at *20 (relying on what in this Court's estimation were conclusory statements by the plaintiff that COVID-19 "caused the covered property to become uninhabitable or unusable, or nearly eliminated or destroyed its functionality" to conclude that COVID-19 has the same impact as the physical substances involved in cases like *Port Authority*, *Hardinger*, and *First Presbyterian Church*).

Plaintiffs' argument that confirmed cases of COVID-19 existed everywhere does not transform the Mandated Shutdown Rules from "orders of general[] applicability" (as Plaintiffs themselves describe them) meant to contain the spread of COVID-19 into "orders of specific applicability" as to Plaintiffs' properties, surrounding properties, and dependent properties. (*See* ECF No. 246, at 71–72 & n.18.)

Plaintiffs argue, based on some cases that have allowed claims like theirs to proceed past motions to dismiss, that the meaning of "direct physical loss of or damage to" is ambiguous because there is another reasonable meaning of the phrase that does not require a physical alteration to property or loss of use that is so substantial that the property becomes uninhabitable or useless, but rather only requires some loss of intended use of property. But the Court concludes that the cases on which Plaintiffs rely to advance that argument also cannot carry the day here.

One of the frequently cited cases in Plaintiffs' Brief in Opposition to the Motion to Dismiss is *Ungarean, DMD v. CNA*, No. 20-6544, 2021 WL 1164836 (Pa. Com. Pl. Mar. 25, 2021). There, the court concluded that "physical" loss of or damage to property was established where "the spread of COVID-19, and a desired limitation of the same," directly impacted "the ways in which Plaintiff materially utilized its property." *Id.* at *7; *see also MacMiles*, 2021 WL 3079941, at *6; *Brown's Gym*, 2021 WL 3036545, at *20. Under that reasoning, the term "physical" refers only to the property that is impacted and not the cause of that impact. In this Court's estimation, such an interpretation of the policy is for these purposes unreasonable, because the only way to use covered property—to, for example, operate a restaurant or a hair salon—is to "materially utilize[] it." Hence, in this Court's judgment, the interpretation in *Ungarean* and the similar cases cited by Plaintiffs renders the term "physical" wholly irrelevant, and the analysis then becomes in essence circular. In addition and importantly here, at oral argument, Plaintiffs conceded that the word

"physical" requires that the covered cause of loss must itself be "physical in nature," and in doing so tempered their reliance on cases like *Ungarean* as to the specific issue of what "physical" means. (*See* ECF No. 270, at 90:13–91:6, 157:1–:6.)

*Ungarean* also concluded that because "the concepts of 'loss' and 'damage' are separated by the disjunctive 'or,' . . . the terms must mean something different from each other," and that "whereas the meaning of the term 'damage' encompasses all forms of harm to Plaintiff's property (complete or partial), . . . the meaning of the term 'loss' reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property." 2021 WL 1164836, at *6. This Court, like the *Ungarean* court and others that have decided COVID-19 business interruption insurance cases, "ha[s] no quarrel with the idea that the disjunctive indicates that 'loss' means something different from 'damage.'" *Sandy Point*, 20 F.4th at 327.

But the difference that the *Ungarean* court stated is too broad for these purposes. It suggests that any time that a property owner must "*physically* limit the use of property and the number of people that c[an] inhabit *physical* buildings at any given time," "direct physical loss of" property has occurred. *Ungarean*, 2021 WL 1164846, at *7. In this Court's estimation, such a conclusion goes too far, as it does not give sufficient weight to the reality that commercial property insurance policies are intended to protect *property*—not a particular *use* of that property for a particular business purpose. Unless the loss of use is so great that it results in the functional loss to the property that renders it useless, with the inability to use the property for any purpose whatsoever pending affirmative and non-routine remediation—the "higher threshold" that most courts have imposed when plaintiffs plead "direct physical loss of or damage to" property caused by an invisible source, *Port Auth.*, 311 F.3d at 235—policies that insure the property itself (as opposed

to only the use of that property) are not implicated.

Plaintiffs have not, and cannot, meet that "higher threshold" showing. Perhaps the most significant reason for this is that stated above—that while the same COVID-19 pandemic that Plaintiffs experienced also impacted other business and property owners, a significant segment of those entities continued to use and inhabit their properties all throughout the pandemic, even when presence of COVID-19 virus particles on some of those properties has almost certainly been more likely than it was as to the properties involved here (such as in hospitals where medical professionals cared for individuals suffering from COVID-19 infection).

As devastating as COVID-19 has been from a health and safety standpoint, property has not been lost or damaged by the presence of the virus, in the sense that people cannot access, use, or inhabit it due to its impaired physical condition, because the COVID-19 virus altered the property itself. If any properties impacted by COVID-19 continued to be structurally intact and useable, then other like or similar properties were not rendered structurally damaged or unusable by the same virus. *See Bookwalter*, 946 F.3d at 162; *Cordish Companies*, 573 F. Supp. 3d at 1000.[26]

### v.   <u>The Reasonable Expectations Doctrine</u>

In at least one jurisdiction whose law applies to actions in this MDL—Pennsylvania—the reasonable expectations doctrine in insurance law may entitle a policyholder to coverage based on the policyholder's reasonable expectations even if the terms of the insurance contract clearly and

---

[26] During oral argument, Plaintiffs and Erie disagreed about whether the air within a property is covered property under Erie's Policies. (*See* ECF No. 270, at 135:19, 174:2–:7, 177:19–:23.) The Court need not decide that issue since the natural dissipation of COVID-19 virus particles from the air without human intervention, as Plaintiffs have pleaded as a characteristic of the virus, distinguishes the virus and its impact on the air within Plaintiffs' properties from substances that cause "direct physical loss of or damage to" property such that Plaintiffs cannot claim coverage based on COVID-19's physical presence on their properties.

unambiguously preclude coverage. *See Moody*, 513 F. Supp. 3d at 502 (citing *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994)). Plaintiffs assert that this doctrine should entitle them to coverage even if this Court concludes—as it does here—that the language of the Policies clearly and unambiguously precludes the coverage sought.

The district court in *Penn Asian Services v. Selective Insurance Co. of South Carolina* summarized Pennsylvania's reasonable expectations doctrine:

> In Pennsylvania, insurers cannot orally promise one thing and then hand over a cumbersome written contract that says another. *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1353 (Pa. 1978). If insurers "abuse their position" and "create[ ] in the insured a reasonable expectation of coverage," "that expectation will prevail over the language of the policy." *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1311 (3d Cir. 1994). For expectations to control, the insurers must engage in some sort of misconduct, like "actively providing misinformation about the scope of coverage" or "failing to notify the insured of changes in the policy." *Id.* at 1312. Plus, of course, the insured's expectation must be "reasonable." *Collister*, 388 A.2d at 1354.

No. 20-4919, 2021 WL 4478215, at *5 (E.D. Pa. Sept. 30, 2021).

Erie argues that "Plaintiffs fail to allege any misconduct on the part of Erie," and that "Plaintiffs' supposed expectations were not reasonable because the terms of the Policies clearly and unambiguously do not provide coverage for Plaintiffs' economic losses." (ECF No. 239, at 90.) In response, Plaintiffs argue: (1) they have alleged misconduct by Erie in "failing to adequately define terms in the policy," "attempting to deny coverage based on technical nature of coverage and exclusion language," "taking advantage of and manipulating ISO materials following the SARS outbreak," and "immediately coordinating and refusing to honor coverage obligations in light of the pandemic shutdowns"; and (2) their expectations of coverage for their claims here were reasonable due to the "complicated terms of their lengthy Policies" and "the nature of those 'all risk' Policies." (ECF No. 246, at 88–89.)

The Court concludes that Plaintiffs have not plausibly pleaded facts to support application

of the reasonable expectations doctrine to actions in this case. First, Plaintiffs have not plausibly pleaded misconduct by Erie. The policy terms at issue in these actions are defined within the Policies. While those definitions may require some analysis to be understood, that does not make the definitions "inadequate." That the terms within Erie's Policies, including definitions of those terms, may not be second nature to an ordinary reader is not the legal standard to be applied.

As the Sixth Circuit wrote in *Santo's*, "[t]here is indeed nothing common about the language of insurance contracts. Then again, there is nothing common about the task at hand—capturing risk and what to pay for it, pricing unknowable future perils in a fair and predictable way. This is a specialized field of language, and aptly so." 15 F.4th at 401. For that reason, basing a grant or denial of coverage on the "technical nature of coverage and exclusion language" is not nefarious—it is part and parcel of administering coverage issues in the insurance context.

As to Erie's alleged "manipulation" of ISO materials, the Court assumes that Plaintiffs are referring to Erie's incorporation of the ISO virus exclusion into its UltraFlex Policy despite the exclusion's allegedly drastic reduction in coverage. The Court addresses Erie's use and characterization of the virus exclusion below in the Exclusions section of this Opinion, and for those reasons, finds no misconduct based on this allegation. But in any event, an insurance carrier's evident and obvious inclusion of an industry exclusion in an insurance policy is simply not "misconduct" at all, let alone the type of "misconduct" that the "reasonable expectations" doctrine requires.

Finally, Plaintiffs have not plausibly shown that Erie wrongfully refused to honor the Policies by issuing "blanket" denials of coverage to Plaintiffs and other similarly situated policyholders. The fact that Erie "issued [] form denial letters" (ECF No. 228 ¶ 185) does not mean that Erie did not sufficiently consider Plaintiffs' claims and decide that those claims and claims

like them are not covered under their Policies, and Plaintiffs have not pleaded any non-conclusory allegations that would substantiate its claims that Erie's investigation into the claims was "perfunctory" and self-serving (*id.*).

The Court also concludes that Plaintiffs did not have a reasonable expectation of coverage based on the "all risks" nature of the Policies or the Policies' "complicated terms." That the terms are complicated is no surprise, as explained above. And that the Policies are "all risk" policies does not mean that an expectation of coverage for *any* event that can be argued in litigation to be a covered cause of loss under the Policies is reasonable. *See Port Auth.*, 311 F.3d at 234 ("[I]n the insurance industry, 'all risks' does not mean 'every risk.'").

Thus, Plaintiffs have not plausibly pleaded coverage under their Policies under the reasonable expectations doctrine.

### b.  Exclusions

Erie contends that "[e]ven if Plaintiffs could establish [] coverage [for their claimed losses], [] their losses would be excluded by the Policies' Law and Ordinance exclusion," and losses of Plaintiffs with the UltraFlex Policy would also be "excluded by that Policy's virus exclusion." (ECF No. 239, at 18.) For the reasons explained below, this Court agrees with Erie as to the virus exclusion in the UltraFlex Policy, but the Court concludes that Plaintiffs' would have plausibly shown that the law and ordinance exclusion would be inapplicable if coverage existed. However, because Plaintiffs have not plausibly pleaded coverage for their claims, the Court's conclusion as to the law and ordinance exclusion does not change the outcome of the Motion to Dismiss as to any Plaintiff.

### i.  Law and Ordinance Exclusion

The first exclusion that the parties debate is the "law and ordinance" exclusion, which

excludes from coverage any additional income protection for loss of or damage to property "caused directly or indirectly by . . . the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property." (ECF No. 228-2, at 6–7.) Erie argues that the Mandated Shutdown Rules are plainly "law[s] or ordinance[s] regulating the . . . use . . . of [Plaintiffs'] property" (ECF No. 239, at 84), while Plaintiffs argue that the term "use" as used in the law and ordinance exclusion relates to "construction, repair, demolition," and other activities related to the "structural integrity" of property, given the surrounding language in the exclusion (ECF No. 246, at 78–79). In its Reply Brief, Erie argues that Plaintiffs' analysis of the law and ordinance exclusion is in effect an admission that "(1) no physical damage to their property requiring construction or repair or concerning structural integrity ever occurred and (2) the term 'use' as used in the Policy, applies only to 'physical use' of property, and not 'use of a property for a particular purpose.'" (ECF No. 249, at 23–24.)

Here, the Court concludes that the meaning of the law and ordinance exclusion is ambiguous and requires the Court to construe its meaning in Plaintiffs' favor, because Plaintiffs and Erie each present reasonable alternative meanings of the word "use" in the exclusion. Erie's position that the Mandated Shutdown Rules relate to the type of "use" contemplated in the law and ordinance exclusion—a position that the Court considers despite the fact that Erie does not reinforce that position in its Reply Brief—is reasonable based on the plain language of the law and ordinance exclusion.

The Mandated Shutdown Rules in Illinois announced by Governor JB Pritzker, for example, "requir[ed] all business that offered 'food or beverages for on-premises consumption' to cease such service and prohibit[ed] all public and private gatherings of 50 people or more." (ECF No. 228 ¶¶ 139, 140.) These rules were thus laws that for these purposes regulated how certain

businesses—those that serve food or beverages and those that host gatherings of people—could use their properties: they could no longer serve food or beverages in person on the premises (though likely could allow takeout), and they could not host gatherings of a certain size.

According to Plaintiffs, however, the surrounding language of the law and ordinance exclusion suggests that in context, "use" refers to types of use akin to "construction" and "repair," given that the word "use" is surrounded by the words "construction" and "repair" and that the law and ordinance exclusion includes other language emphasizing the construction- and repair-related scope of the exclusion. (ECF No. 246, at 78–79.) This position is reasonable because the meaning of language in an insurance policy is not based only on the plain meaning of any particular word or phrase in isolation, but also on the context in which that language appears. *See, e.g.*, *Ceres Enterprises, LLC*, 520 F. Supp. 3d at 955–56.

When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Group*, 879 A.2d 166, 170 (2005). "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 897 (2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted). A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

Because the meaning of "use" in the law and ordinance exclusion is "reasonably susceptible of [the] different interpretations" put forth by Erie and Plaintiffs and "capable of being

understood in more than one sense," its meaning is ambiguous, and the court must construe the exclusion in favor of Plaintiffs. *Moody*, 513 F. Supp. 3d at 502. However, given that Plaintiffs have not plausibly pleaded coverage, and given that the virus exclusion unambiguously precludes coverage for UltraFlex Policy Plaintiffs as explained below, the outcome of the Motion to Dismiss is not altered.

### ii.  <u>Virus Exclusion</u>

Plaintiffs also argue that the UltraFlex Policy's "virus exclusion"—which excludes from coverage any additional income protection for loss of or damage to property "caused . . . [b]y or resulting from any virus, bacterium, or other microorganism that induces or is capable of inducing physical distress, illness, or disease" (ECF No. 228-2, at 7–9)—does not apply to the circumstances alleged in the CAC, and that even if it did, the exclusion is unenforceable in the actions in which the applicable jurisdiction's law recognizes the doctrine of regulatory estoppel. (*See* ECF No. 246, at 79–85.) The virus exclusion presents a more straightforward question than the law and ordinance exclusion; Plaintiffs' arguments in these regards cannot carry the day and lead the Court to conclude that the virus exclusion would be enforceable and unambiguously would preclude coverage here.

First, Plaintiffs assert that under the "efficient proximate cause doctrine," the UltraFlex Policy Plaintiffs' claimed losses are covered despite the virus exclusion because the Mandated Shutdown Rules, and not the virus itself, were "the last step in the chain of causation" of the losses, and the Mandated Shutdown Rules are a covered cause of loss. (*Id.* at 80 (citing *Totty v. Chubb Corp.*, 455 F. Supp. 2d 376, 386 n.6 (W.D. Pa. 2006); *O'Neill v. State Farm Ins. Co.*, No. 94-3428, 1995 WL 214409, at *3 (E.D. Pa. Apr. 7, 1995)).) In other words, Plaintiffs say that even though the COVID-19 virus alone spurred the Mandated Shutdown Rules, it was the Mandated Shutdown

Rules that directly caused Plaintiffs' business losses, and the virus's contribution to that chain of events is immaterial.

Relatedly, Plaintiffs argue that the absence of anti-concurrent causation language from the UltraFlex Policy's virus exclusion means that losses caused concurrently by more than one event, including a virus within the scope of the virus exclusion and a separate cause outside the scope of the exclusion, are not excluded. (*Id.* at 80–81 ("[The absence of anti-concurrent causation language in the virus exclusion] evidences an intent to insure a covered loss that is caused by a combination of events, *i.e.*, the Mandated Shutdown Rules, even if one of those events in the chain of causation is excluded.").)

These arguments come up short because, as explained at length above, the Mandated Shutdown Rules are not a covered cause of loss because they did not cause "direct physical loss of or damage to" Plaintiffs' properties, nor are they themselves "physical." The efficient proximate cause doctrine only applies "when the loss is caused by a *covered peril* even where excluded perils also contributed to the loss." *Totty*, 455 F. Supp. 2d at 386 n.6 (emphasis added). Because the Mandated Shutdown Rules are not a covered peril, the efficient proximate cause doctrine does not apply. Further, the absence of anti-concurrent causation language from the UltraFlex Policy's virus exclusion is immaterial because Plaintiffs have not plausibly alleged *any* covered cause of loss, which is necessary to argue that a loss is covered despite the concurrent impact of an excluded event.[27]

---

[27] Erie also argues that "the presence or absence of anti-concurrent causation language in the virus exclusion is irrelevant" because "[t]he government orders cannot be viewed in isolation—they plainly were issued in response to the coronavirus pandemic, as Plaintiffs admit." (ECF No. 239, at 89.) Thus, as Erie sees it, Plaintiffs have not alleged that there were two independent but concurrent causes of their business losses, and rather, there is only one alleged cause (the virus), making anti-concurrent causation language irrelevant. Because the Court concludes that Plaintiffs' anti-concurrent causation language argument lacks merit for another reason—namely that the absence of anti-concurrent causation language from the UltraFlex Policy's virus exclusion is immaterial because Plaintiffs have not plausibly alleged *any* covered cause of loss, which is necessary to argue that a loss is covered despite the concurrent impact of an excluded event—the Court does not decide whether Plaintiffs' alleged concurrent causes of their business

Second, Plaintiffs argue that the virus exclusion is intended to exclude losses caused by contamination of premises by a virus, while Plaintiffs have instead claimed coverage for losses caused by the general "circulati[on] [of a virus] in a community and [] government act[ions] to curb the spread." (ECF No. 246, at 81.) Plaintiffs own allegations in its CAC belie this argument, because Plaintiffs have pleaded that the virus *was* present on their properties and contaminated the properties. The Court questioned Plaintiffs about this during oral argument, and Plaintiffs stated that they "ple[aded] in the alterative" and "are perfectly entitled to do [so] at the complaint stage." (ECF No. 270, at 156.) Regardless of the propriety of Plaintiffs' approach, however, their argument that the virus exclusion does not apply because Plaintiffs' have pleaded as one alternative theory that the virus did not cause their alleged losses lacks merit, because the other alleged cause of the losses—the Mandated Shutdown Rules—is not a covered cause of loss, as Plaintiffs conceded at oral argument.

Third, Plaintiffs argue that even if the UltraFlex Policy's virus exclusion by its terms excludes Plaintiffs' claimed losses, the exclusion is unenforceable under the doctrine of regulatory estoppel. In jurisdictions that recognize the doctrine, such as Pennsylvania,[28] regulatory estoppel "prohibits parties from switching legal positions to suit their own ends." *Moody*, 513 F. Supp. 3d at 511 (citing *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1192 (Pa. 2001)). A policyholder pleading a claim for regulatory estoppel against an insurer must allege that (1) the insurer "made a statement to a regulatory agency" and (2) that the insurer "later adopted a position contrary to the one presented to the regulatory agency." *Id.*

---

losses are "separate enough" such that the absence of anti-concurrent causation language is irrelevant for that reason, as Erie contends.

[28] As Erie notes, several jurisdictions whose law applies to the actions in this MDL do not recognize the doctrine of regulatory estoppel. (ECF No. 249, at 26 & n.31 (citing cases that indicate that regulatory estoppel does not apply in Illinois, New York, Tennessee, or Virginia).)

Plaintiffs argue that these elements are met here. First, the Insurance Services Office (ISO) and the American Association of Insurance Services (AAIS) "represented hundreds of insurers," including Erie, "in a national effort to seek approval from state insurance regulators for the adoption of various virus exclusion provisions," thereby, say the Plaintiffs, making the involved statements to regulatory agencies on behalf of Erie. (ECF No. 228 ¶ 222; *see* ECF No. 246, at 84.) Second, Plaintiffs allege that the insurance industry "represented to insurance regulators . . . that the new virus exclusions did not involve a significant decrease in coverage without a commensurate reduction in policy premiums," but that Erie has "assert[ed] the opposit[e] position in response to Plaintiffs' claims." (ECF No. 246, at 83–84.)

The Court concludes that the regulatory estoppel principle does not apply here because Plaintiffs have neither plausibly pleaded that Erie, directly or via the ISO or the AAIS, made a statement to regulators, nor have Plaintiffs plausibly shown that assuming that it should be treated as though Erie did make a relevant statement to regulators in some way, Erie switched its position between the time the insurance industry sought regulatory approval of virus exclusions like that in the UltraFlex Policy and now as Erie seeks dismissal of the actions in this MDL.

As to the first element, Plaintiffs have failed to allege that Erie itself made a statement about the virus exclusion to regulators or that the ISO or the AAIS specifically represented Erie in making such statements. Plaintiffs simply state that the ISO and the AAIS "represented hundreds of insurers" in an effort to seek regulatory approval for virus exclusion provisions, and that the ISO's and the AAIS's statements were "assertions made by the insurance industry (including Defendants)." (ECF No. 228 ¶¶ 222, 227.) Attributing the ISO's and the AAIS's statements to Erie just because Erie is a party within the insurance industry is wholly conclusory and does not plausibly show that the ISO or the AAIS represented Erie, or made any statements on behalf of

Erie, in its submissions to the involved regulators.

Plaintiffs' statement in their Response to the Motion to Dismiss that "Erie does not deny being a member of ISO or AAIS, nor do Defendants dispute that those organizations made misrepresentations to insurance regulators . . . on the insurance industry's (including Erie Insurance Group['s] behalf" (ECF No. 246, at 84) is immaterial, because it is Plaintiffs that bear the burden of pleading facts that plausibly show that a claim on which relief can be granted exists.

Plaintiffs urge the Court to construe regulatory estoppel as applying when any player within the insurance industry makes a statement to a regulator at any time, and a different player in the insurance industry makes a contrary statement in litigation at any subsequent time. The Court declines to adopt such a sweeping view of the regulatory estoppel doctrine.

Much of the case law discussing regulatory estoppel focuses on the second element of a claim under the doctrine—whether the insurer took a position in litigation contrary to the position presented to a regulatory agency—but of those that discuss the first element, most have disagreed with the reasoning Plaintiffs advance here and have required the statement to the regulatory agency to have been made by the litigant-insurer itself. *Compare Moody*, 513 F. Supp. 3d at 512 (concluding that the plaintiff had not plausibly pleaded that the insurer made a statement to a regulator because the plaintiff did not allege that the insurer made the statement itself or that the ISO made the statement on the insurer's behalf), *and Maggios Famous Pizza, Inc. v. Selective Ins. Co. of the Sw.*, No. CV 20-2603, 2021 WL 6051562, at *6 (E.D. Pa. Dec. 21, 2021) (same), *and ATCM Optical, Inc. v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 513, 524–25 (E.D. Pa. 2021) (same), *and Border Chicken AZ LLC v. Nationwide Mut. Ins. Co.*, 501 F. Supp. 3d 699, at 706–07 (D. Ariz. 2020) (concluding that the plaintiff's "belief" that the ISO represented the defendant-insurer without any supporting specific allegations of action or representation made by the insurer

was insufficient under *Iqbal* pleading standards), *and Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, 499 F. Supp. 3d 95, 101 (E.D. Pa. 2020) (finding the first element of a regulatory estoppel claim was satisfied because the plaintiff pleaded that the ISO and the AAIS presented to regulators on behalf of defendant specifically), *with Certain Underwriters at Lloyd's London v. U.S. Steel Corp.*, No. 12-000409, Memorandum and Order of Court (Pa. Ct. Com. Pls. Dec. 11, 2014) (Wettick, J.) (concluding that in Pennsylvania, a misrepresentation by a party in the insurance industry "extends responsibility to all insurance companies . . . as a matter of public policy") *and Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, No. CIV. A. 93-3438 (JCL, 1995 WL 861533, at *2 (D.N.J. Dec. 15, 1995) (same). This Court finds the majority approach persuasive, as it focuses on the conduct engaged in or adopted by a party in litigation rather than on broader invocations of public policy and will apply that approach here.

Plaintiffs' regulatory estoppel claim also fails on the second element. The CAC alleges that "[i]n their filings with the various state regulators on behalf of the insurers, ISO and AAIS represented that the adoption of the virus exclusion provisions was only meant to 'clarify' that coverage for 'disease-causing agents' has never been in effect, and was never intended to be included, in the property policies." (ECF No. 228 ¶ 223.) In this Court's estimation, Erie's position in its Motion to Dismiss—that "the coronavirus does not cause damage to property; it harms people," and thus is not a covered cause of loss under the Policies (ECF No. 239, at 65)—is consistent with the ISO's and the AAIS's representation to regulators that commercial property insurance policies are not intended to insure against viruses.

Plaintiffs' regulatory estoppel argument does not have support just because Plaintiffs assert that the insurance industry's statements to regulators were misrepresentations at the time they were made. For instance, Plaintiffs claim that when the industry "falsely characterized [the virus

exclusion] as a mere 'clarification' on existing coverage," the industry "was well aware that policies had been found to cover a variety of claims for property loss or damage from disease-causing agents, including E. coli bacteria, mold, pesticides, and many other similar agents." (ECF No. 246, at 83.)

Setting aside the conclusory nature of this claim, in that Plaintiffs have not plausibly alleged that the members of the insurance industry making statements to regulators about the virus exclusion were actually aware of the decisions by courts that coverage had been found to cover events like viruses, this assertion also does not state a claim upon which relief can be granted. Even if the parties within the insurance industry who made those statements to regulators thought or knew that the statements were false at the time based on cases that had concluded that some disease-causing agents are in fact covered causes of loss, Erie has not asserted a position in this litigation that is contrary to the position that the virus exclusion is a clarification of the policies' coverage language rather than an intended significant decrease in coverage that was previously available.

Finally, in addition arguing that the virus exclusion in the UltraFlex Policy is inapplicable or unenforceable in actions in which that Policy applies, Plaintiffs also argue that as for the Ultrapack Plus Policy and Plaintiffs who have that policy, "the absence of a virus exclusion in the Ultrapack Plus Policy suggests that th[at] Policy covers virus-related losses." (ECF No. 246, at 85.) Other courts have rejected this argument, and this Court agrees with their analysis. *See, e.g.*, *Kim-Chee*, 2022 WL 258569, at *2 (2d Cir.) ("Kim-Chee's policy does not contain a virus exclusion. Thus, Kim-Chee argues, the policy must cover losses 'caused by or resulting from' the coronavirus. We disagree. '[T]he absence of an exclusion cannot create coverage; the words used in the policy must themselves express an intention to provide coverage . . . .' Because Kim-Chee

Case 1:21-mc-00001-MRH   Document 285   Filed 10/14/22   Page 66 of 67

'never established its initial entitlement to coverage, we need not consider what consequences for that coverage might have arisen from the virus exclusion.' Kim-Chee has not shown it suffered a covered loss under its insurance policy, and the absence of the virus exclusion does not alter this conclusion." (alterations in original) (citations omitted)); *Sweet Berry Cafe, Inc. v. Soc'y Ins., Inc.*, 193 N.E.3d 962, 975 (Ill. App. Ct. 2022), ("[The plaintiff] also notes that Society's policy did not contain a virus exclusion. We conclude that this is of no import here. Unless the policy already granted coverage, which it does not do, a virus exclusion was not necessary. Further, the absence of an exclusion cannot "'create an ambiguity in an otherwise unambiguous insuring clause.'"), *appeal denied*, 2022 IL 128399 (Ill. Sept. 28, 2022); *Sanzo Enters., LLC v. Erie Ins. Exch.*, 182 N.E.3d 393, 406 (Ohio Ct. App. 2021) ("[T]he absence of a virus exclusion in the policy does not impact the meaning of the phrase 'direct physical loss of or damage to property.'"). Thus, the Court concludes that the absence of the virus exclusion in the Ultrapack Plus Policy does not show that virus-related claims are covered under that Policy.

## VI.   <u>CONCLUSION</u>

As the Court trusts that it conveyed to the parties at oral argument, it is self-evident that the COVID-19 pandemic has had detrimental consequences to people all over the world that cannot be overstated. However, it can also be accurate that the Erie Policies to which the Plaintiffs in this MDL were parties do not provide coverage for the additional consequences that Plaintiffs assert that they as property and business owners suffered as a result of the pandemic and the associated government orders limiting how the properties could be used. For the reasons explained above, the Court concludes that Plaintiffs have not plausibly pleaded that they are entitled to coverage for their claimed losses under the Erie Policies. The Court will therefore GRANT Erie's

66

Motion to Dismiss Counts One, Two, Three, and Four of the CAC (ECF No. 238).[29]

      An appropriate Order will issue.

                                              s/ Mark R. Hornak           
                                              Mark R. Hornak
                                              Chief United States District Judge

Dated: October 14, 2022
cc:     All counsel of record (via CM/ECF)

---

[29] As noted above, by their concurrence with the requirements the Court imposed as to leave to file their CAC, Plaintiffs have foreclosed the ability to further amend under the circumstances present here in which no intervening change in controlling law or the discovery of facts previously unknowable could justify further amendment. The Court further concludes that in any event, given the basis for the Court's decision here, the Plaintiffs could not amend their CAC to allege additional facts or law that would plausibly show that they are entitled to such coverage. Thus, any amendment to the Complaint would be futile. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that leave to amend is properly denied where "any attempted additional amendment of [the] pleading would be futile"); *see also LabMD Inc. v. Boback*, 47 F.4th 164, 192–93 (3d Cir. 2022) (stating that a "District Court [is] not obligated to grant leave to amend of its own accord" in non-civil rights cases).